DOCKETED
DEC 1 0 2003

FILED-ER4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| DANIEL TAUBENFELD, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) No. |
| CAREER EDUCATION CORPORATION, JOHN M. LARSON and PATRICK K. PESCH, | ) ) ) |
| Defendants. | ) ) ) |

03C 8884

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE NOLAN

*JURY TRIAL DEMANDED*

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Career Education Corp. ("CEC" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.      This is a federal class action on behalf of persons who purchased the securities of CEC between April 22, 2003 and December 2, 2003, inclusive (the "Class Period"), who have suffered damages thereby, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").



2. CEC is a provider of private, for-profit postsecondary education, with 51 campuses throughout the United States, Canada, France, the United Kingdom and the United Arab Emirates. CEC owns and operates schools in the following career-related fields: Visual Communication and Design Technologies, Information Technology, Business Studies, Culinary Arts, and Health Education.

3. The Company's business is highly regulated by federal, state and private accrediting agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS"). The Company's business and stock price is crucially dependent on maintaining compliance with federal and state rules, and on its accreditation and reputation with students and employers.

4. Throughout the Class Period, the Company publicly touted its business and financial performance, the performance of its stock price and its industry leading position as reasons for why investors should purchase its stock. For example, on a webpage titled "Why Invest in CEC?", the Company represented that it has "demonstrated operational excellence," enjoys a "strong competitive advantage," is "a growth leader in a growth market," and has "a graduate placement record that consistently ranks among the industry leaders." Similar representations touting CEC's business and growth were included in the Company's press releases, SEC filings and conference calls. Such representations were materially false and misleading because, unbeknownst to investors, they failed to disclose that CEC had been regularly falsifying student records in order to increase graduation rates and enrollment, conceal problems that could have threatened the accreditation of its schools, and generally, to allow it to increase its profitability. Among other things, CEC's schools graduated students who had not completed required courses and regularly credited and billed students for taking courses the

2

students had never attended. Because many of CEC's students receive federal financial aid, the federal government footed tuition bills for courses not attended or passed by students. CEC improperly recognized and reported such payments as revenue. The strong growth reported by the Company throughout the Class Period was grounded in these fraudulent and inherently unsustainable practices, rendering CEC's reported historical financial performance and projections of future growth materially false and misleading.

5.      Defendants were highly motivated to engage in the fraud alleged herein so that CEC insiders could sell their personally held CEC stock at artificially inflated prices. Throughout the Class Period, Career Education insiders sold a total of 1.7 million (split-adjusted) shares of Career Education common stock at artificially inflated prices, reaping gross proceeds in excess of *$69 million*. That amount includes defendant Larson's proceeds of *$22.4 million* and defendant Pesch's *$11.2 million*.

6.      In addition, defendants were further motivated to artificially inflate the Company's results and stock price so that CEC could complete the strategic acquisition of Whitman Education Group, Inc. using its stock as currency. The fraud allowed the Company to execute the acquisition on more favorable terms than if the truth about the Company's business practices had been known. On July 1, 2003, CEC announced that it had acquired Whitman Education Group, Inc. in a combination cash and share exchange transaction valued at $245 million.

7.      On November 11, 203, the *Bergen Record*, a local New Jersey newspaper, reported that a former director of CEC's Gibbs College in New Jersey had alleged that the school regularly graduated students who did not complete required courses or attend mandatory internships. These allegations were made in a wrongful termination action filed by the former

3

director of Gibbs College in the Superior Court of New Jersey on November 5, 2003. The former director alleges that she was terminated after repeatedly complaining to her supervisors about the fraudulent business practices she regularly witnessed at the school. Because the story appeared in a local New Jersey daily with very limited circulation, it was not digested by the market and did not immediately affect the Company's stock price.

8. On November 17, 2003, the Company issued a press release announcing the filing of the wrongful termination action. In a press release, the Company denied the allegations, stating that "[t]he company believes the lawsuit is without merit and intends to vigorously defend itself." The Company's stock price plummeted on the news, falling from $52.70 per share on November 14, 2003 to $42.56 per share on November 17 (the next trading day), a one-day drop of 19.2%. However, CEC's stock price rebounded over the next few weeks as the market shrugged off the allegations in the lawsuit as isolated and unlikely to have a materially negative impact the Company's overall operations, consistent with the Company's representations regarding the matter.

9. However, on December 3, 2003, the market learned that similar accusations of wrongdoing had been leveled by a highly-placed employee of a different CEC school in California. On December 3, 2003, *Bloomberg News* reported that the former registrar of CEC's Brooks Institute of Photography in Santa Barbara, California filed a complaint with ACICS alleging that the school falsified student records to ensure that the school passed inspections by accreditation auditors and to increase enrollment. *Bloomberg News* quoted the former registrar as alleging that "*Many staff members have been asked by management to commit forgery, fraud, perjury or whatever is necessary to pass audit inspections*." (Emphasis added). On December 4,

4

2003, *The Street.com* quoted the former registrar as stating that "*officials at the school acted illegally and improperly to inflate enrollment and boost the bottom line.*" (Emphasis added).

10.     In reaction to this latest revelation, CEC's stock price plummeted again, falling from $54.76 per share on December 2, 2003 to $39.48 on December 3, 2003, a one-day drop of 28%, on trading volume of 18.2 million shares -- more than nine times the Company's three-month daily average.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. '§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. ' 240.10b-5].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §1337, and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District and CEC maintains its headquarters in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.    Plaintiff, Daniel Taubenfeld, as set forth in the accompanying certification, incorporated by reference herein, purchased common stock of CEC at artificially inflated prices during the Class Period and has been damaged thereby.

16.    Defendant CEC is a corporation organized under the laws of Delaware with its principal executive offices located at 2895 Greenspoint Parkway, Suite 600, Hoffman Estates, IL 60195.

17.    Defendant John M. Larson was CEC's Chief Executive Officer, President and Chairman of the Board throughout the Class Period.

18.    Defendant Patrick K. Pesch was CEC's Chief Financial Officer, Treasurer and Secretary throughout the Class Period.

19.    Defendants Larson and Pesch are referred to herein as the "Individual Defendants."

20.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of CEC were privy to confidential and proprietary information concerning CEC, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning CEC, as discussed in detail below. Because of their positions with CEC, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such

information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of CEC's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq National Market ("Nasdaq") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to CEC's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CEC's securities would be based

7

upon truthful and accurate information. The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants are liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of CEC's securities by disseminating materially false and misleading statements and/or concealing materially adverse facts. The scheme deceived the investing public regarding CEC's business, operations and management and the intrinsic value of CEC's securities, and caused Plaintiff and members of the Class to purchase CEC's securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of CEC between April 22, 2003 and December 2, 2003, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and/or directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, there were approximately 100 million shares of CEC common stock actively traded on the Nasdaq (the Company's stock split 2:1 on August 25, 2003). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CEC or its transfer agent and may be notified of

the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    i)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

    ii)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of CEC; and

    iii)    to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**SUBSTANTIVE ALLEGATIONS**

## Materially False and Misleading Statements Disseminated
## During the Class Period

**The First Quarter of 2003**

31.     The Class Period begins on April 22, 2003. On that date CEC issued a press release, headlined "Career Education Corporation Posts Record First Quarter Results," marking its "21st consecutive quarter of record results since becoming a public company." The Company summarized its results for the first quarter of 2003 as follows:

> First quarter 2003 revenues were $245.6 million, up 39 percent from $176.3 million for the same period last year. First quarter 2003 net income was $19.2 million, or $0.40 per diluted share, up 61 percent and 54 percent, respectively, from first quarter 2002 net income of $12.0 million, or $0.26 per diluted share.

Defendant Larson touted the Company's results, attributing its seeming success to the reputation of its schools and track record of finding jobs for students after graduation. In addition, Larson reiterated that the Company signed a definitive merger agreement to acquire Whitman Education Group Inc. earlier in the quarter, stating as follows in relevant part:

> "Career Education Corporation had an outstanding first quarter, delivering outstanding organic growth and enhanced operating margins," said John M. Larson, Chairman, President and Chief Executive Officer. "We also completed a nine-campus acquisition in France with the INSEEC Group and announced a definitive merger agreement with Whitman Education Group, Inc. that will significantly enhance CEC's platform in health education."

> "Our first quarter 2003 lead flow was up approximately 52 percent over the same period last year proving that our marketing message is effectively reaching an increasing number of high school graduates, young adults, career changers and international students," Mr. Larson said. "Students come to CEC schools because of the school's reputation for delivering a high quality education, demonstrated track record in job placement, and exclusive focus on 21st century careers, including visual communication and design, IT, business, culinary arts and health education."

32.     On May 15, 2003, CEC filed its quarterly report for the first quarter of 2003 with the SEC on Form 10-Q (the "1Q03 Report"). The 1Q03 Report reiterated the financial information contained in the April 22, 2003 press release and was signed by defendants Larson

10

and Pesch. In a section of the 1Q03 Report titled "Basis of Presentation," the Company represented that the financial information contained therein was prepared in accordance with GAAP and fairly presented the Company's results, stating as follows in relevant part:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10−Q and Article 10 of Regulation S−X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

33.    In the section of the 1Q03 Report titled "Managements Discussion and Analysis of Financial Condition and Results of Operation," the Company summarized its quarterly results as follows:

> Our revenue increased from $176.3 million during the three months ended March 31, 2002 to $245.5 million for the same period during 2003. In addition, our net income increased from $12.0 million during the first three months of 2002 to $19.2 million during the same period in 2003. For the three months ended March 31, 2003, income from operations increased $11.2 million or 57%, to $30.9 million during 2003 from $19.7 million for the same period during 2002. Income from operations as a percentage of revenue improved from 11.2% during the first three months of 2002 to 12.6% for the same period during 2003.

34.    In discussing the risks and uncertainties facing the Company, the 1Q03 Report referred readers to "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and Results of Operations—Risks Related to Our Business' in our Annual Report on Form 10−K/A for our fiscal year ended December 31, 2002." The Form 10-K/A purported to warn investors that the Company is subject to strict regulatory oversight by the U.S. Department of Education, stating in this regard, as follows:

> **Failure to Comply with Extensive Regulations Could Have a Material Adverse Effect on our Business**
>
> ***Failure of our U.S. schools to comply with extensive regulations could result in financial penalties, restrictions on our operations or loss of external financial aid funding.***

11

We derive a significant portion of our revenue from U.S. federal student financial aid programs administered by the U.S. Department of Education. To participate in these programs, a U.S. institution must obtain and maintain authorization by the appropriate state agencies, accreditation by an accrediting agency recognized by the Department of Education, and certification by the Department of Education. As a result, our U.S. schools are subject to extensive regulation by these agencies. These regulations cover virtually all phases of our operations, including our educational programs, facilities, instructional and administrative staff, administrative procedures, marketing and recruiting, financial operations, including the payment of refunds to students who withdraw, and financial strength. These regulations also affect our ability to acquire or open additional schools, add new educational programs or change our corporate structure. The agencies that regulate our operations periodically revise their requirements and modify their interpretations of existing requirements. If one of our schools were to violate any of these regulatory requirements, we could suffer a financial penalty. A regulatory agency could also place limitations on our schools' operations or terminate the schools' ability to grant degrees and certificates or their eligibility to receive federal student financial aid funds. We cannot predict with certainty how all of these requirements will be applied, or whether each of our schools will be able to comply with all of the requirements in the future. [Emphasis in original].

35. The representations referenced above from the Company's April 22, 2003 press release and 1Q03 were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others:

a. during the Class Period CEC had systematically falsified student records in order to increase graduation and enrollment rates and to conceal problems to help its schools pass audits conducted by the ACICS and the U.S. Department of Education, among other agencies;

b. a material portion of the Company's reported revenues were derived through fraudulent business practices, such as federal grants and financial aid payments made based on records and representations that were falsified by the Company;

c. the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

12

        d.     contrary to statements in its press releases, the Company's success was not attributable solely to the supposed strength of its business or its supposed competitive advantages, rather, a material portion of its results were attributable to fraudulent and prohibited business practices;

        e.     the Company's purported risk warnings failed to disclose that the Company had falsified student records and defrauded the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would have a devastating impact on CEC's business; and

        f.     that the Company's results were not prepared and reported in accordance with GAAP and did not fairly present its actual financial results or condition.

**The Second Quarter of 2003**

36.    On July 1, 2003, CEC announced that it had acquired Whitman Education Group, Inc. in a combination cash and share exchange transaction valued at $245 million. Under the terms of the offer, "Whitman's shareholders will receive $6.00 in cash and 0.138 shares of CEC common stock for each share of Whitman common stock." The Company's plan to acquire Whitman Education had been announced prior to the Class Period and was touted as an important strategic acquisition for CEC. In the July 1, 2003 press release, defendant Larson stated that "[t]his strategic combination will allow us to significantly enhance our position in the rapidly-growing health education field, while further expanding our leadership in information technology and business studies."

37.    On July 22, 2003, CEC issued a press release announcing its 22nd consecutive quarter of "record" results for the second quarter of 2003. The Company also announced a two

for one stock split. The Company summarized its performance in the quarter and the first six
months of 2003 as follows:

> Second quarter 2003 revenues were $256.1 million, up 44 percent from $178.4
> million for the same period last year. Second quarter 2003 net income was $19.6
> million, or $0.40 per diluted share, nearly double last year's net income of $10.3
> million, or $0.22 per diluted share.
>
> For the six months ended June 30, 2003, revenues were $501.6 million, up 41
> percent from $354.7 million for the same period last year. Net income for the first
> half of 2003 was $38.8 million, or $0.80 per diluted share, up 74 percent from
> $22.3 million, or $0.47 per diluted share.

Defendant Larson attributed the reported record results to the "excellent reputation" of CEC's

schools, among other factors, stating as follows in relevant part:

> "As the record second quarter and first half results demonstrate, 2003 is another defining
> year for Career Education Corporation," said John M. Larson, chairman, president and
> chief executive officer. "Every element of our multi-pronged growth strategy is working
> as we continue to deliver enhanced operating results.
>
> "We are achieving high organic growth rates as record numbers of high school graduates
> and adult students seek high quality career programs at all degree levels," Mr. Larson
> said. "CEC schools have excellent reputations in the high-demand career fields of visual
> communication and design, IT, business, culinary arts and health education. Our broad
> geographic reach, full range of degree options and targeted marketing programs make our
> educational programs highly accessible to motivated students looking to succeed in their
> career field."

38.     On August 13, 2003, the Company filed its quarterly report for the second quarter

of 2003 with the SEC on Form 10-Q (the "2Q03 Report"). The 2Q03 Report reiterated the

financial information contained in the July 22, 2003 press release and was signed by defendants

Larson and Pesch. In a section of the 2Q03 Report titled "Basis of Presentation," the Company

represented that the financial information contained therein was prepared in accordance with

GAAP and fairly presented the Company's results, stating as follows in relevant part:

> The accompanying unaudited condensed consolidated financial statements have
> been prepared in accordance with generally accepted accounting principles for
> interim financial information and the instructions to Form 10-Q and Article 10 of
> Regulation S-X. Accordingly, they do not include all of the information and

footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

39.    In the section of the 2Q03 Report titled "Managements Discussion and Analysis of Financial Condition and Results of Operation," the Company summarized its results for the quarter as follows:

> Our revenue increased from $354.7 million during the six months ended June 30, 2002 to $501.6 million for the same period during 2003 and from $178.4 million during the second quarter of 2002 to $256.1 million during the second quarter of 2003. In addition, our net income increased from $22.3 million during the first six months of 2002 to $38.8 million during the same period in 2003 and from $10.3 million during the second quarter of 2002 to $19.6 million during the second quarter of 2003. For the six months ended June 30, 2003, income from operations increased $26.3 million or 71%, to $63.3 million from $37.0 million for the same period during 2002. During the second quarter of 2003, income from operations increased $15.1 million or 87%, to $32.4 million from $17.3 million for the same period during 2002. Income from operations as a percentage of revenue improved from 10.4% during the first six months of 2002 to 12.6% for the same period during 2003 and from 9.7% during the second quarter of 2002 to 12.6% during the second quarter of 2003. A significant portion of our increases in revenue and income from operations and our improvement in income from operations as a percentage of revenue improvement during the three months and six months ended June 30, 2003 is attributable to the growth and continued maturation of AIU Online, whose operating margin percentage is higher than those of our campus–based schools.

40.    In discussing the risks and uncertainties that the Company is exposed to, the 2Q03 Report referred readers to "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and Results of Operations—Risks Related to Our Business' in our Annual Report on Form 10–K/A for our fiscal year ended December 31, 2002." The Form 10–K/A purported to warn investors that the Company is subject to strict regulatory oversight by the U.S. Department of Education, stating as follows regarding the matter:

> **Failure to Comply with Extensive Regulations Could Have a Material Adverse Effect on our Business**

***Failure of our U.S. schools to comply with extensive regulations could result in
financial penalties, restrictions on our operations or loss of external financial
aid funding.***

We derive a significant portion of our revenue from U.S. federal student financial
aid programs administered by the U.S. Department of Education. To participate in
these programs, a U.S. institution must obtain and maintain authorization by the
appropriate state agencies, accreditation by an accrediting agency recognized by
the Department of Education, and certification by the Department of Education.
As a result, our U.S. schools are subject to extensive regulation by these agencies.
These regulations cover virtually all phases of our operations, including our
educational programs, facilities, instructional and administrative staff,
administrative procedures, marketing and recruiting, financial operations,
including the payment of refunds to students who withdraw, and financial
strength. These regulations also affect our ability to acquire or open additional
schools, add new educational programs or change our corporate structure. The
agencies that regulate our operations periodically revise their requirements and
modify their interpretations of existing requirements. If one of our schools were to
violate any of these regulatory requirements, we could suffer a financial penalty.
A regulatory agency could also place limitations on our schools' operations or
terminate the schools' ability to grant degrees and certificates or their eligibility to
receive federal student financial aid funds. We cannot predict with certainty how
all of these requirements will be applied, or whether each of our schools will be
able to comply with all of the requirements in the future. [Emphasis in original].

41.     The representations referenced above from the Company's April 22, 2003 press

release and 2Q03 were each materially false and misleading when made because they failed to

disclose and misrepresented the following material adverse facts, among others:

a.     during the Class Period CEC had systematically falsified student

records in order to increase graduation and enrollment rates and to conceal problems to help its

schools pass audits conducted by the ACICS and the U.S. Department of Education, among other

agencies;

b.     a material portion of the Company's reported revenues were

derived through fraudulent business practices, such as federal grants and financial aid payments

made based on records and representations that were falsified by the Company;

16

c.    the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

d.    contrary to statements in its press releases, the Company's success was not attributable solely to the supposed strength of its business or its supposed competitive advantages, rather, a material portion of its results were attributable to fraudulent and prohibited business practices;

e.    the Company's purported risk warnings failed to disclose that the Company had falsified student records and defrauded the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would  have a devastating impact on CEC's business; and

f.    that  the Company's results were not prepared and reported in accordance with GAAP  and did not fairly present its actual financial results or condition.

**The Third Quarter of 2003**

42.    On October 21, 2003, CEC reported yet another quarter of "record" results, its 23rd record quarter as a publicly traded company. The Company summarized its performance for the third quarter and nine months of 2003 as follows:

> Third quarter 2003 revenues were $315.7 million, up 60 percent from $197.2 million for the same period last year. Third quarter 2003 net income was $26.9 million, or $0.26 per diluted share, up 90 percent from last year's net income of $14.2 million, or $0.15 per diluted share. For the nine months ended September 30, 2003, revenues were $817.3 million, up 48 percent from $551.8 million for the same period last year. Net income for the first nine months of 2003 was $65.8 million, or $0.66 per diluted share, up 80 percent from last year's net income of $36.5 million, or $0.39 per diluted share.

Defendant Larson attributed the reported results to the Company's successful business plan,

stating as follows:

> "Career Education Corporation continues to deliver record results, with the third quarter serving as a clear demonstration of the vitality and scalability of our business model," said John M. Larson, chairman, president and chief executive officer. "Third quarter results were driven by significant revenue and profitability gains in our online business, continued strong organic growth in our on-campus operations, and better than expected results from the recently acquired, former Whitman and INSEEC campuses. All of these factors helped drive our quarterly margin improvement of 210 basis points year-over-year.

> "As the results demonstrate, CEC is delivering on all fronts," Mr. Larson said. "The growth of our online business continues to outperform expectations and was the primary contributor to our exceeding third quarter revenue and earnings guidance. Our Online Education Group generated approximately $44 million in revenues during the third quarter and is on course to generate more than $140 million in revenues in 2003. This estimate is significantly higher than our 2002 revenues of $20 million.

43.     On November 13, 2003, the Company filed its quarterly report for the third quarter of 2003 with the SEC on Form 10-Q (the "3Q03 Report"). The 3Q03 Report reiterated the financial information contained in the October 21, 2003 press release and was signed by defendants Larson and Pesch. In a section of the 3Q03 Report titled "Basis of Presentation," the Company represented that the financial information contained therein was prepared in accordance with GAAP and fairly presented the Company's results, stating as follows in relevant part:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

44.     In the section of the 3Q03 Report titled "Managements Discussion and Analysis of Financial Condition and Results of Operation," the Company summarized its results for the quarter as follows:

Our revenue increased from $551.8 million during the nine months ended September 30, 2002 to $817.3 million for the same period during 2003 and from $197.2 million during the third quarter of 2002 to $315.7 during the third quarter of 2003. In addition, our net income increased from $36.5 million during the first nine months of 2002 to $65.8 million during the same period in 2003 and from $14.2 million during the third quarter of 2002 to $26.9 million during the third quarter of 2003. For the nine months ended September 30, 2003, income from operations increased $47.5 million or 78%, to $108.8 million from $61.3 million for the same period during 2002. During the third quarter of 2003, income from operations increased $21.2 million or 87%, to $45.5 million from $24.3 million for the same period during 2002. Income from operations as a percentage of revenue improved from 11.1% during the first nine months of 2002 to13.3% for the same period during 2003 and from 12.3% during the third quarter of 2002 to 14.4% during the third quarter of 2003. A significant portion of our increases in revenue and income from operations and our improvement in income from operations as a percentage of revenue during the three and nine month periods ended September 30, 2003 is attributable to the growth and continued maturation of our Online Education Group, whose operating margin percentage is higher than that of our campus−based schools.

45.     In discussing the risks and uncertainties facing the Company, the 3Q03 Report referred readers to, "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and Results of Operations—Risks Related to Our Business' in our Annual Report on Form 10−K/A for our fiscal year ended December 31, 2002." The Form 10−K/A purported to warn investors that the Company is subject to strict regulatory oversight by the U.S. Department of Education, stating as follows regarding the matter:

**Failure to Comply with Extensive Regulations Could Have a Material Adverse Effect on our Business**

***Failure of our U.S. schools to comply with extensive regulations could result in financial penalties, restrictions on our operations or loss of external financial aid funding.***

We derive a significant portion of our revenue from U.S. federal student financial aid programs administered by the U.S. Department of Education. To participate in these programs, a U.S. institution must obtain and maintain authorization by the appropriate state agencies, accreditation by an accrediting agency recognized by the Department of Education, and certification by the Department of Education. As a result, our U.S. schools are subject to extensive regulation by these agencies. These regulations cover virtually all phases of our operations, including our educational programs, facilities, instructional and administrative staff,

administrative procedures, marketing and recruiting, financial operations, including the payment of refunds to students who withdraw, and financial strength. These regulations also affect our ability to acquire or open additional schools, add new educational programs or change our corporate structure. The agencies that regulate our operations periodically revise their requirements and modify their interpretations of existing requirements. If one of our schools were to violate any of these regulatory requirements, we could suffer a financial penalty. A regulatory agency could also place limitations on our schools' operations or terminate the schools' ability to grant degrees and certificates or their eligibility to receive federal student financial aid funds. We cannot predict with certainty how all of these requirements will be applied, or whether each of our schools will be able to comply with all of the requirements in the future. [Emphasis in original].

46.     The representations referenced above from the Company's April 22, 2003 press release and 3Q03 were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others:

a.      during the Class Period CEC had systematically falsified student records in order to increase graduation and enrollment rates and to conceal problems to help its schools pass audits conducted by the ACICS and the U.S. Department of Education, among other agencies;

b.      a material portion of the Company's reported revenues were derived through fraudulent business practices, such as federal grants and financial aid payments made based on records and representations that were falsified by the Company;

c.      the Company's reported results did not accurately portray the Company's operations because a material portion of those results were attributable to prohibited practices;

d.      contrary to statements in its press releases, the Company's success was not attributable solely to the supposed strength of its business or its supposed competitive advantages, rather, a material portion of its results were attributable to fraudulent and prohibited business practices;

20

e.     the Company's purported risk warnings failed to disclose that the Company had falsified student records and defrauded the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would  have a devastating impact on CEC's business; and

f.     that  the Company's results were not prepared and reported in accordance with GAAP  and did not fairly present its actual financial results or condition.

**The Company's Website Touts CEC's Historical Results and Expected Growth**

47.     During the Class Period, CEC's website, in a page titled "Why Invest in CEC", touted the strength of CEC's competitive position, the strong performance of its stock price and the Company's favorable prospects for continued growth. In relevant part, the Company highlighted the following as reason to invest in CEC:

*CEC's growth prospects for the future remain bright, for five key reasons.*

» CEC is a growth leader in a growth market. Employer demands for a better-educated workforce and societal and demographic trends are creating a larger pool of potential students. CEC is well positioned to benefit because its curricula prepare students for careers in fields where current and future demand is strong. These factors will enable CEC to continue setting the growth pace among providers of private, for-profit postsecondary education.

» CEC's multi-faceted growth strategy is a proven success. The company consistently has achieved annual internal growth exceeding its stated 20 percent target. Supplementing internal growth are CEC's 26 acquisitions to date, which have broadened the company's geographic scope and contributed to growth in both revenues and earnings.

» CEC's demonstrated operational excellence creates a strong competitive advantage that is reflected in: marketing programs that continue to attract students in record numbers from all segments of the potential student population; career-focused educational programs that prepare graduates for successful careers in attractive, high-growth fields; innovative retention programs that help make sure students complete their education;

21

and a graduate placement record that consistently ranks among the industry leaders.

» CEC's entry into the high-potential field of online education provides another avenue to future growth. AIU Online and CTU Online, Online CEC's Education Group, offers academic programs that capitalize on the full multimedia potential of E-learning and a groundbreaking virtual campus that provides students with a total online learning environment.

» Offering a full range of educational options - associate, bachelor's, master's, and doctoral degrees and non-degree diploma and certificate programs - enables CEC to meet the educational needs of students throughout their lifetimes as they advance in their careers or make new career choices.

48.     The representations referenced above from the Company's website were each materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, among others:

a.      during the Class Period CEC had systematically falsified student records in order to increase graduation rates and enrollment rates and to pass audits by the ACICS and the U.S. Department of Education, among other agencies;

b.      a material portion of the Company's reported revenues were derived through fraudulent business practices, such as federal grants and financial aid payments made to based on records and representations that were falsified by the Company;

c.      contrary to the Company's statements, CEC's reported results were not attributable solely to the supposed strength of its business or its supposed competitive advantages, rather, a material portion of its results were attributable to fraudulent and prohibited business practices; and

d.      given the inherently unsustainable nature of the source of a material portion of the Company's revenue, the extraordinary risk of regulatory fines and the risk

that the accreditation of its schools could be revoked, the Company's statements that CEC was poised for continued strong growth was deceptive and provided false comfort to investors.

## The Truth Begins to Emerge

49.      On November 11, 203, the *Bergen Record*, a local New Jersey newspaper, reported that a former director of CEC's Gibbs College in New Jersey had alleged that the school regularly graduated students who did not complete required courses or attend mandatory internships. These allegations were made in a wrongful termination action filed by the former director in the Superior Court of New Jersey on November 5, 2003. The former director alleges that she was terminated after repeatedly complaining to her supervisors about the fraudulent business practices she regularly witnessed at the school. Because the story appeared in a local New Jersey daily with very limited circulation, it not digested by the market and did not immediately affect the Company's stock price.

50.      On November 17, 2003, the Company issued a press release announcing the filing of the wrongful termination action. In a press release, the Company denied the allegations, stating that "[t]he company believes the lawsuit is without merit and intends to vigorously defend itself." The Company's stock price plummeted on the news, falling from $52.70 per share on November 14, 2003 to $42.56 per share on November 17 (the next trading day), a one-day drop of 19.2%. However, CEC's stock price rebounded over the next few weeks as the market shrugged off the allegations in the lawsuit as isolated and unlikely to have a materially negative impact the Company's overall operations, consistent with the Company's representations regarding the matter.

51.      However, on December 3, 2003, the market learned that similar accusations of wrongdoing were leveled by a highly-placed employee of a different CEC school, in California.

On December 3, 2003, *Bloomberg News* reported that the former registrar of CEC's Brooks Institute of Photography in Santa Barbara, California alleged filed a complaint with ACICS alleging that the school falsified student records to ensure that the school passed inspections by accreditation auditors and to increase enrollment. *Bloomberg News* quoted the former registrar as alleging that "***Many staff members have been asked by management to commit forgery, fraud, perjury or whatever is necessary to pass audit inspections***." (Emphasis added). On December 4, 2003, *The Street.com* reported that the former registrar further quoted the former registrar as stating that "***officials at the school acted illegally and improperly to inflate enrollment and boost the bottom line***." (Emphasis added).

52.     In reaction to this latest revelation, CEC's stock price plummeted again, falling from $54.76 per share on December 2, 2003 to $39.48 on December 3, 2003, a one-day drop of 28%, on trading volume of 18.2 million shares -- more than nine times the Company's three-month daily average. In reaction to this latest revelation, CEC's stock price plummeted again, falling from $54.76 per share on December 2, 2003 to $39.48 on December 3, 2003, a one-day drop of 28%, on trading volume of 18.2 million shares -- more than nine times the Company's three-month daily average.

## DEFENDANTS' CLASS PERIOD STATEMENTS VIOLATED GAAP

53.     Throughout the Class Period, CEC and the Individual Defendants issued materially false and misleading statements and omitted to disclose material information regarding CEC's financial status and used improper accounting practices in violation of Generally Accepted Accounting Principles and SEC reporting requirements to falsely inflate and report revenues and earnings.

54.     GAAP is recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a

particular time. GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting principles. SEC Regulation S-X requires that publicly traded companies present their annual financial statements in accordance with GAAP. 17 C.F.R. § 210.401(a)(1). In addition, Regulation S-X requires that interim financial statements also comply with GAAP, with the exception that interim financial statements also comply with GAAP, with the exception that interim financial may omit disclosures which would substantially duplicate those disclosures which accompany the annual financial statements. 17 C.F.R. § 210.10.01(a). Financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

55.     As set forth in Financial Accounting Standard Board ("FASB") Statement of Financial Accounting Concepts ("SFAC") No. 1, one of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented. SFAC No. 1, ¶42. states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investments and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of enterprise performance.

Additionally, Section 13 of the Exchange Act requires, in part, that companies:

> devise and maintain a system of internal controls sufficient to provide reasonable assurances that - -
>
> *  *  *
>
> transactions are recorded as necessary (I) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets.

25

56.     SFAC No. 1 states that financial reporting, *i.e.*, financial statements and the related footnote disclosures, is intended to provide information that is useful to the users of the statements in making business and economic decisions.  By presenting investors with financial information that did not reflect the true nature of fraudulent and inappropriate business practices, CEC did not provide useful information in the Company's financial statements.

57.     Similarly, SFAC No. 1 states that "[f]inancial reporting is expected to provide information about an enterprise's financial performance during a period and about how management of an enterprise has discharged its stewardship responsibility to owners."  By presenting revenues and expenses that were grossed up by fraudulent business practices, defendants did not present the Company's actual financial performance. Results obtained through such business practices do not accurately reflect the Company's operations, are highly deceptive to investors, and are inherently unsustainable.

58.     SFAC No. 2 describes the characteristics required to make accounting information useful to the people that use it.  One of these characteristics is representational faithfulness, which is defined as "correspondence or agreement between a measure or description and the phenomenon that it purports to represent (sometimes called validity)."

59.     Another characteristic defined in SFAC No. 2 is verifiability.  Verifiability is "the ability through consensus among measurers to ensure that information represents what it purports to represent or that the chosen method of measurement has been used without error or bias."

60.     CEC's materially false and misleading financial statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding CEC's actual operating results.  Defendants caused the Company to violate GAAP because defendants knew or recklessly disregarded that CEC's revenues were grossly inflated during the Class Period, as a

result of the employment of fraudulent business practices, such as the falsification of documents used to obtain federal financial aid and grants.

61. Such practices were not legitimate revenue that CEC could recognize pursuant to GAAP. GAAP requires that revenues are not recognized until earned. An entity's revenue-earning activities involve delivering goods, rendering services, or other activities that constitute its ongoing major or central operation. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Readily convertible assets have (i) interchangeable (fungible) units and (ii) quoted prices available in an active market that can rapidly absorb the quantity held by the entity without significantly affecting the price. SFAC No.5, ¶¶ 83-84. However, by, among other things, falsifying student records, CEC improperly recognized revenue because financial aid payments made by the federal government in reliance on fraudulent records created by CEC is not convertible to known amounts of cash or claims to cash due to their illegitimate nature and risk of disgorgement.

62. Thus, a material portion of the tuition payments made to CEC were not legitimate and did not generate revenue that CEC could recognize pursuant to GAAP. As a result, CEC knowingly overstated the Company's revenue and earnings based on these transactions.

## ADDITIONAL SCIENTER ALLEGATIONS

63. As alleged herein, defendants acted with scienter in that defendants knew that the public statements or documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding CEC, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CEC, participated in the fraudulent scheme alleged herein.

64.     In addition, defendants were strongly motivated to commit the wrongdoing alleged herein in order to allow CEC insiders, including the Individual Investors, to sell their personally held shares of the Company's common stock at artificially inflated prices. As is illustrated by the following chart, CEC insiders sold a total of 1.7 million shares of CEC common stock during the Class Period, reaping gross proceeds in excess of *$69 million*. The following insider trading data is adjusted to reflect the 2:1 stock split effective August 25, 2003:

**John M. Larson (CEO, President, Chairman:**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|------|-------------|---------------------|-----------------|
| 4/25/2003 | 20,000 | 28.05 | 561,000.00 |
| 4/25/2003 | 16,000 | 28.28 | 452,400.00 |
| 4/25/2003 | 11,000 | 28.25 | 310,750.00 |
| 4/25/2003 | 10,000 | 28.03 | 280,250.00 |
| 4/25/2003 | 10,000 | 28.03 | 280,300.00 |
| 4/25/2003 | 3,000 | 28.28 | 84,840.00 |
| 4/28/2003 | 30,000 | 28.26 | 847,800.00 |
| 4/28/2003 | 20,000 | 28.11 | 562,200.00 |
| 4/28/2003 | 20,000 | 28.56 | 571,100.00 |
| 4/28/2003 | 16,000 | 28.42 | 454,640.00 |

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 4/28/2003 | 15,000 | 28.40 | 426,000.00 |
| 4/28/2003 | 10,000 | 28.60 | 286,000.00 |
| 4/28/2003 | 10,000 | 29.00 | 290,000.00 |
| 4/28/2003 | 5,000 | 28.41 | 142,025.00 |
| 4/28/2003 | 4,000 | 28.33 | 113,300.00 |
| 7/25/2003 | 50,000 | 41.10 | 2,055,000.00 |
| 7/25/2003 | 44,000 | 41.15 | 1,810,600.00 |
| 7/25/2003 | 40,000 | 41.07 | 1,642,800.00 |
| 7/25/2003 | 20,000 | 41.12 | 822,300.00 |
| 7/25/2003 | 10,000 | 40.97 | 409,700.00 |
| 7/25/2003 | 10,000 | 40.99 | 409,900.00 |
| 7/25/2003 | 10,000 | 41.08 | 410,750.00 |
| 7/25/2003 | 10,000 | 41.11 | 411,100.00 |
| 7/25/2003 | 4,000 | 41.13 | 164,500.00 |
| 7/25/2003 | 2,000 | 41.26 | 82,520.00 |
| **Total** | **580,000** | | **$22,470,775.00** |

**Patrick K. Pesch (CFO, Treasurer, Secretary):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 4/25/2003 | 36,800 | 28.50 | 1,048,800.00 |
| 4/25/2003 | 10,000 | 28.55 | 285,500.00 |
| 4/25/2003 | 1,200 | 29.00 | 34,800.00 |

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 4/28/2003 | 16,000 | 28.50 | 456,000.00 |
| 4/28/2003 | 10,000 | 28.63 | 286,250.00 |
| 4/28/2003 | 10,000 | 29.00 | 290,000.00 |
| 4/28/2003 | 10,000 | 29.15 | 291,500.00 |
| 4/28/2003 | 5,000 | 29.05 | 145,250.00 |
| 4/28/2003 | 5,000 | 29.08 | 145,375.00 |
| 4/28/2003 | 5,000 | 29.13 | 145,625.00 |
| 4/28/2003 | 3,000 | 29.10 | 87,300.00 |
| 8/14/2003 | 160,000 | 44.38 | 7,100,000.00 |
| 8/14/2003 | 20,000 | 44.50 | 890,000.00 |
| **Total** | **292,000** | | **$11,206,400.00** |

**Todd H. Steele (Executive Vice President of Strategic Planning and Development):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 5/15/2003 | 44,000 | 30.51 | 1,342,220.00 |
| 5/15/2003 | 20,000 | 30.75 | 615,000.00 |
| 5/15/2003 | 10,000 | 30.70 | 307,000.00 |
| 5/15/2003 | 10,000 | 30.73 | 307,250.00 |
| 5/15/2003 | 6,000 | 30.65 | 183,900.00 |
| 8/13/2003 | 30,000 | 43.73 | 1,311,750.00 |
| 8/13/2003 | 26,000 | 43.94 | 1,142,440.00 |
| 8/13/2003 | 22,000 | 43.79 | 963,380.00 |

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 8/13/2003 | 20,000 | 43.75 | 875,000.00 |
| 8/13/2003 | 5,000 | 43.78 | 218,900.00 |
| 8/13/2003 | 3,000 | 43.80 | 131,400.00 |
| 9/24/2003 | 18,000 | 47.90 | 862,200.00 |
| 9/24/2003 | 17,023 | 48.00 | 817,104.00 |
| 9/24/2003 | 7,845 | 48.08 | 377,187.60 |
| 9/24/2003 | 6,000 | 48.03 | 288,180.00 |
| 9/24/2003 | 6,000 | 48.05 | 288,300.00 |
| 9/24/2003 | 5,000 | 48.09 | 240,450.00 |
| 9/24/2003 | 1,633 | 47.75 | 77,975.75 |
| 9/24/2003 | 1,340 | 48.10 | 64,454.00 |
| 9/24/2003 | 1,100 | 48.06 | 52,866.00 |
| 9/24/2003 | 1,059 | 47.97 | 50,800.23 |
| 9/24/2003 | 1,000 | 47.78 | 47,780.00 |
| 9/24/2003 | 500 | 47.76 | 23,880.00 |
| 9/24/2003 | 146 | 48.12 | 7,025.52 |
| **Total** | **262,646** | | **$10,596,443.10** |

**Jacob P. Gruver (President of the Colleges, Schools and Universities Group of CEC):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 7/25/03 | 168,000 | 41.55 | 6,979,560.00 |
| 7/29/03 | 12,000 | 41.75 | 501,000.00 |

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 7/29/03 | 7,680 | 41.38 | 317,760.00 |
| 7/29/03 | 6,000 | 41.25 | 247,500.00 |
| 7/29/03 | 6,000 | 41.28 | 247,650.00 |
| 7/29/03 | 3,600 | 41.63 | 149,850.00 |
| 7/29/03 | 2,286 | 41.65 | 95,211.90 |
| 7/29/03 | 1,680 | 41.40 | 69,552.00 |
| 7/29/03 | 1,560 | 41.44 | 64,638.60 |
| 7/29/03 | 1,440 | 41.15 | 59,256.00 |
| 7/29/03 | 1,032 | 41.39 | 42,709.32 |
| 7/29/03 | 960 | 41.16 | 39,513.60 |
| 7/29/03 | 600 | 41.41 | 24,843.00 |
| 7/29/03 | 480 | 41.15 | 19,752.00 |
| 7/29/03 | 480 | 41.38 | 19,862.40 |
| 7/29/03 | 360 | 41.17 | 14,821.20 |
| 7/29/03 | 360 | 41.18 | 14,823.00 |
| 7/29/03 | 360 | 41.34 | 14,880.60 |
| 7/29/03 | 288 | 41.39 | 11,920.32 |
| 7/29/03 | 240 | 41.40 | 9,934.80 |
| 7/29/03 | 240 | 41.44 | 9,945.60 |
| 7/29/03 | 240 | 41.47 | 9,952.80 |
| 7/29/03 | 114 | 41.66 | 4,748.67 |
| **Total** | **216,000** | | **$8,969,685.81** |

**Nick Fluge (President of the Online Education Group of CEC):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|------|-------------|---------------------|-----------------|
| 7/25/2003 | 136,000 | 41.55 | 5,650,120.00 |
| 7/29/2003 | 8,000 | 41.75 | 334,000.00 |
| 7/29/2003 | 5,120 | 41.38 | 211,840.00 |
| 7/29/2003 | 4,000 | 41.25 | 165,000.00 |
| 7/29/2003 | 4,000 | 41.28 | 165,100.00 |
| 7/29/2003 | 2,400 | 41.63 | 99,900.00 |
| 7/29/2003 | 1,524 | 41.65 | 63,474.60 |
| 7/29/2003 | 1,120 | 41.40 | 46,368.00 |
| 7/29/2003 | 1,040 | 41.44 | 43,092.40 |
| 7/29/2003 | 960 | 41.15 | 39,504.00 |
| 7/29/2003 | 688 | 41.39 | 28,472.88 |
| 7/29/2003 | 640 | 41.16 | 26,342.40 |
| 7/29/2003 | 400 | 41.41 | 16,562.00 |
| 7/29/2003 | 320 | 41.15 | 13,168.00 |
| 7/29/2003 | 320 | 41.38 | 13,241.60 |
| 7/29/2003 | 240 | 41.17 | 9,880.80 |
| 7/29/2003 | 240 | 41.18 | 9,882.00 |
| 7/29/2003 | 240 | 41.34 | 9,920.40 |
| 7/29/2003 | 192 | 41.39 | 7,946.88 |
| 7/29/2003 | 160 | 41.40 | 6,623.20 |
| 7/29/2003 | 160 | 41.44 | 6,630.40 |
| 7/29/2003 | 160 | 41.47 | 6,635.20 |

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 7/29/2003 | 76 | 41.66 | 3,165.78 |
| **Total** | **168,000** | | **$6,976,870.54** |

**Robert E. Dowdell (Director, Member of Compensation Committee):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 5/1/2003 | 20,000 | 29.67 | 593,400.00 |
| 5/1/2003 | 14,000 | 29.58 | 414,050.00 |
| 5/1/2003 | 10,000 | 29.62 | 296,200.00 |
| 5/1/2003 | 6,000 | 29.68 | 178,080.00 |
| 5/2/2003 | 12,000 | 29.60 | 355,200.00 |
| 8/18/2003 | 10,000 | 45.85 | 458,450.00 |
| 8/18/2003 | 5,706 | 45.95 | 262,190.70 |
| 8/18/2003 | 2,600 | 45.85 | 119,197.00 |
| 8/18/2003 | 1,600 | 45.91 | 73,456.00 |
| 8/18/2003 | 1,442 | 45.90 | 66,187.80 |
| 8/18/2003 | 1,000 | 45.83 | 45,825.00 |
| 8/18/2003 | 1,000 | 45.84 | 45,840.00 |
| 8/18/2003 | 702 | 45.96 | 32,263.92 |
| 8/18/2003 | 600 | 45.92 | 27,552.00 |
| 8/18/2003 | 400 | 45.83 | 18,332.00 |
| 8/18/2003 | 400 | 45.88 | 18,350.00 |
| 8/18/2003 | 400 | 45.98 | 18,392.00 |

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 8/18/2003 | 200 | 45.87 | 9,174.00 |
| 8/18/2003 | 200 | 45.92 | 9,183.00 |
| 8/18/2003 | 200 | 46.03 | 9,206.00 |
| 8/18/2003 | 150 | 45.80 | 6,870.00 |
| 8/19/2003 | 8,600 | 45.83 | 394,095.00 |
| 8/19/2003 | 6,000 | 46.10 | 276,600.00 |
| 8/19/2003 | 4,100 | 45.66 | 187,185.50 |
| 8/19/2003 | 1,600 | 45.78 | 73,240.00 |
| 8/19/2003 | 1,400 | 46.06 | 64,484.00 |
| 8/19/2003 | 800 | 46.01 | 36,804.00 |
| 8/19/2003 | 600 | 45.75 | 27,450.00 |
| 8/19/2003 | 200 | 45.77 | 9,153.00 |
| 8/19/2003 | 100 | 46.22 | 4,622.00 |
| 9/18/2003 | 1,162 | 50.09 | 58,204.58 |
| 9/18/2003 | 1,100 | 50.10 | 55,110.00 |
| 9/18/2003 | 1,038 | 50.08 | 51,983.04 |
| 9/18/2003 | 700 | 50.11 | 35,077.00 |
| 9/18/2003 | 500 | 50.07 | 25,035.00 |
| 9/18/2003 | 400 | 50.13 | 20,052.00 |
| 9/18/2003 | 373 | 50.05 | 18,668.65 |
| 9/18/2003 | 200 | 50.16 | 10,032.00 |
| 9/18/2003 | 127 | 50.02 | 6,352.54 |
| 9/18/2003 | 100 | 50.14 | 5,014.00 |

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 9/18/2003 | 100 | 50.15 | 5,015.00 |
| 9/18/2003 | 100 | 50.17 | 5,017.00 |
| **Total** | **117,900** | | **$4,426,593.73** |

**Thomas B. Lally (Director, Member of Compensation, Auditing and Nominating Committees):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 4/25/2003 | 15,000 | 28.54 | 428,100.00 |
| 4/25/2003 | 10,000 | 28.51 | 285,050.00 |
| 4/25/2003 | 10,000 | 28.28 | 282,750.00 |
| 4/25/2003 | 7,000 | 28.38 | 198,625.00 |
| 4/25/2003 | 3,000 | 28.28 | 84,840.00 |
| 4/25/2003 | 3,000 | 28.30 | 84,900.00 |
| 7/25/2003 | 14,000 | 41.15 | 576,100.00 |
| 7/25/2003 | 10,000 | 41.53 | 415,250.00 |
| 7/25/2003 | 10,000 | 41.63 | 416,250.00 |
| 7/25/2003 | 8,000 | 41.80 | 334,400.00 |
| 7/25/2003 | 4,000 | 41.13 | 164,500.00 |
| 7/25/2003 | 2,000 | 41.26 | 82,520.00 |
| **Total** | **96,000** | | **$3,353,285.00** |

**Wallace O. Laub (Director, Member of Nominating and Compensation Committees):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 4/30/2003 | 12,000 | 30.00 | 360,000.00 |
| 4/30/2003 | 10,000 | 29.55 | 295,500.00 |
| 4/30/2003 | 10,000 | 29.58 | 295,750.00 |
| 5/12/2003 | 13,000 | 30.30 | 393,900.00 |
| 5/12/2003 | 3,000 | 30.40 | 91,200.00 |
| 7/25/2003 | 10,000 | 41.53 | 415,250.00 |
| 7/25/2003 | 10,000 | 41.63 | 416,250.00 |
| 7/25/2003 | 8,000 | 41.80 | 334,400.00 |
| 7/25/2003 | 2,000 | 41.13 | 82,250.00 |
| 7/25/2003 | 2,000 | 41.26 | 82,520.00 |
| **Total** | **80,000** | | **$2,767,020.00** |

**Keith K. Ogata (Director, Member of Nominating and Audit Committees):**

| Date | # of Shares | Price Per Share ($) | Total Value ($) |
|---|---|---|---|
| 4/25/2003 | 10,000 | $28.23 | 282,250.00 |
| 4/28/2003 | 16,000 | $29.21 | 467,360.00 |
| 8/18/2003 | 16,000 | $45.34 | 725,440.00 |
| 8/19/2003 | 15,000 | $45.82 | 687,225.00 |
| **Total** | **57,000** | | **$2,162,275.00** |

**Total for all Insiders:**

| Total Shares | 1,781,546 | Total Proceeds | $69,962,598.18 |
|---|---|---|---|

65.     In addition, defendants were further motivated to artificially inflate the Company's results and stock price so that CEC could complete the strategic acquisition of Whitman Education Group, Inc. using its stock as currency. The fraud allowed the Company to execute the acquisition on more favorable terms than if the truth about its business practices were known. On July 1, 2003, CEC announced that it had acquired Whitman Education Group, Inc. in a combination cash and share exchange transaction valued at $245 million.

### Undisclosed Adverse Information

66.     The market for CEC's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, CEC common stock traded at artificially inflated prices during the Class Period.  The artificial inflation continued until December 2, 2003. Plaintiff and other members of the Class purchased or otherwise acquired CEC's common stock relying upon the integrity of the market price of the Company's common stock and market information relating to CEC, and have been damaged thereby.

67.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of CEC common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

68.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.  As described herein, during the

Class Period, defendants made or caused to be made a series of materially false or misleading statements about CEC's financial performance and condition and prospects for continued future growth. These material misstatements and omissions created in the market an unrealistically positive assessment of CEC and its prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the illusion was revealed, and the market was able to accurately value the Company.

### Applicability Of Presumption Of Reliance: <br> Fraud-On-The-Market Doctrine

69. At all relevant times, the market for CEC's securities was an efficient market for the following reasons, among others:

i) CEC stock actively traded on the Nasdaq National Market, a highly efficient and automated market;

ii) As a regulated issuer, CEC filed periodic public reports with the SEC and the Nasdaq;

iii) CEC regularly communicated with public investors _via_ established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

iv) CEC was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

70. As a result of the foregoing, the market for CEC's securities promptly digested current information regarding CEC from all publicly available sources and reflected such information in CEC's stock price. Under these circumstances, all purchasers of CEC's securities during the Class Period suffered similar injury through their purchase of CEC's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

71. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CEC who knew that those statements were false when made.

## COUNT I

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

72.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.     During the Class Period, CEC and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CEC's securities; and (iii) cause Plaintiff and other members of the Class to purchase CEC's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

74.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CEC's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

75.     CEC and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CEC as specified herein.

76. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of CEC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CEC and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CEC's securities during the Class Period.

77. The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

78. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing CEC's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As

demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

79.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CEC's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of CEC's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired CEC securities during the Class Period at artificially high prices and were damaged thereby.

80.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of CEC, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CEC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

81.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

82.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

83.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.    Each of the Individual Defendants acted as a controlling person of CEC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

44

86.     As set forth above, CEC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of CEC's and the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  December 9, 2003

Daniel Taubenfeld, individually and on behalf
of all others similarly situated, Plaintiff

By: _____

Marvin A. Miller
Jennifer W. Sprengel
Anthony F. Fata
**MILLER FAUCHER AND CAFFERTY LLP**
30 North LaSalle Street
Suite 3200
Chicago, Illinois  60602
(312) 782-4880

*Designated Local Counsel*

Steven C. Schulman
Peter E. Seidman
Andrei V. Rado
**MILBERG WEISS BERSHAD HYNES
& LERACH LLP**
One Pennsylvania Plaza
New York, New York  10019
(212) 594-5300

Joshua M. Lifshitz
**BULL & LIFSHITZ**
18 East 41st Street
New York, New York  10017
(212) 213-6222

*Attorneys for Plaintiff*

46

## CERTIFICATE OF NAMED PLAINTIFF

I, Daniel Taubenfeld, certify that:

1.    I have reviewed the complaint and authorized its filing or the filing of a Motion for Lead Plaintiff on my behalf by Bull & Lifshitz, LLP.

2.    I did not purchase the security that is the subject of this action at the direction of plaintiffs' counsel or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in Career Education securities that are the subject of this litigation during the class period set forth in the complaint are as follows:

| Security | Date of Transaction | Amount of Shares Stating Whether Purchased(P) or Sold(S) | Price Per Share |
|---|---|---|---|
| CECO | 10/20/03 | P-43 | $43.959 |
|  |  |  |  |
|  |  |  |  |

5.    I have served as or sought to serve as a representative party on behalf of a Class under this title during the last three years in the referenced actions.

*Taubenfeld v. Independent Energy*, 00cv5986
*Taubenfeld v. Hotels.com, et al* 03cv00069
*Taubenfeld v. Aon Corp. et al* 02cv5631

*Taubenfeld v. Perot Systems Corp.*, 02cv231
*Taubenfeld v. CheckFree*
*Taubenfeld v. Cree*

6.    I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

DANIEL TAUBENFELD

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

DOCKETED
DEC 1 0 2003

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s): Daniel Taubenfeld,** | **Defendant(s):Career Education Corporation, et al.,** |
| County of Residence: Nassau County | County of Residence: |
| Plaintiff's Atty: Miller Faucher and Cafferty LLP<br>30 North LaSalle Street, Suite 3200<br>Chicago, Illinois 60602<br>(312) 782-4880 | Defendant's Atty: |

03C 888 4

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE NOLAN

II. Basis of Jurisdiction:        **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties (Diversity Cases Only)
             Plaintiff:- **N/A**
             Defendant:- **N/A**

IV. Origin :                      **1. Original Proceeding**

V. Nature of Suit:               **850 Securities / Commodities / Exchange**

VI.Cause of Action:              **15 U.S.C. §§ 78j(b) and 78t(a)**

VII. Requested in Complaint
        Class Action:**Yes**
        Dollar Demand:
        Jury Demand:**Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 12/9/03

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

DOCKETED

DEC 1 0 2003

In the Matter of

**Daniel Taubenfeld,**

v.

**Career Education Corporation, et al.,**

Case Number: 03C 8884

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Daniel Taubenfeld, individually and on behalf of all others similarly situated, Plaintiff



JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE NOLAN

| (A) | (B) |
|---|---|
| SIGNATURE *Steven G. Schulman/sws* | SIGNATURE *Marvin A. Miller/sws* |
| NAME Steven G. Schulman | NAME Marvin A. Miller |
| FIRM Milberg Weiss Bershad Hynes & Lerach LLP | FIRM Miller Faucher and Cafferty LLP |
| STREET ADDRESS One Pennsylvania Plaza, 49th Floor | STREET ADDRESS 30 North LaSalle Street, Suite 3200 |
| CITY/STATE/ZIP New York, New York 10119 | CITY/STATE/ZIP Chicago, Illinois 60602 |
| TELEPHONE NUMBER (212) 594-5300    FAX NUMBER 868-1229 | TELEPHONE NUMBER (312) 782-4880    FAX NUMBER 782-4485 |
| E-MAIL ADDRESS | E-MAIL ADDRESS mmiller@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 01916769 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☑ | MEMBER OF TRIAL BAR?   YES ☑   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☑ | TRIAL ATTORNEY?   YES ☑   NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?   YES ☑   NO ☐ |
| (C) | (D) |
| SIGNATURE *Peter E. Seidman/sws* | SIGNATURE |
| NAME Peter E. Seidman | NAME Jennifer Winter Sprengel |
| FIRM Same as (A) | FIRM Same as (B) |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER    FAX NUMBER | TELEPHONE NUMBER    FAX NUMBER |
| E-MAIL ADDRESS | E-MAIL ADDRESS jsprengel@millerfaucher.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204446 |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☑ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☑ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☑   NO ☐ |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

DOCKETED

DEC 1 0 2003

In the Matter of

**Daniel Taubenfeld,**

v.

**Career Education Corporation, et al.**

Case Number: **03C 8884**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Daniel Taubenfeld, individually and on behalf of all others similarly situated, Plaintiff

JUDGE JOAN H. LEFKOW

MAGISTRATE JUDGE NOLAN

| (E) | | | (F) | | |
|---|---|---|---|---|---|
| SIGNATURE *Andrei V. Rado/kws* | | | SIGNATURE *Anthony F. Fata* | | |
| NAME Andrei V. Rado | | | NAME Anthony F. Fata | | |
| FIRM Same as (A) | | | FIRM Same as (B) | | |
| STREET ADDRESS | | | STREET ADDRESS | | |
| CITY/STATE/ZIP | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER | | FAX NUMBER | TELEPHONE NUMBER | | FAX NUMBER |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS afata@millerfaucher.com | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06269721 | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |
| TRIAL ATTORNEY? | YES ☐ | NO ☑ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |
| | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ |
| (G) | | | (H) | | |
| SIGNATURE *Joshua M. Lifshitz/kws* | | | SIGNATURE | | |
| NAME Joshua M. Lifshitz | | | NAME | | |
| FIRM Bull & Liftshitz | | | FIRM | | |
| STREET ADDRESS 18 East 41st Street | | | STREET ADDRESS | | |
| CITY/STATE/ZIP New York, New York 10017 | | | CITY/STATE/ZIP | | |
| TELEPHONE NUMBER (212) 213-6222 | | FAX NUMBER | TELEPHONE NUMBER | | FAX NUMBER |
| E-MAIL ADDRESS | | | E-MAIL ADDRESS | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ |
| TRIAL ATTORNEY? | YES ☐ | NO ☑ | TRIAL ATTORNEY? | YES ☐ | NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☑ | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☑ |