# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DANIEL TAUBENFELD, Individually and )
On Behalf of All Others Similarly Situated, )
                           )
       Plaintiff, )
                           )
         vs. )     No. 03 C 8884
                           )     Judge Joan H. Lefkow
CAREER EDUCATION CORPORATION, )
JOHN M. LARSON and PATRICK K. PESCH, )
                           )
       Defendants. )

## MEMORANDUM OPINION AND ORDER

Lead plaintiff, Thomas Schroder, individually and on behalf of a class of purchasers of the securities of defendant Career Education Corporation ("CEC") between January 28, 2003 and December 2, 2003 (the "Class Period"), filed this lawsuit alleging that defendants, CEC, John M. Larson ("Larson"), and Patrick K. Pesch ("Pesch") (1) violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under § 78j(b); and (2) violated § 20(a) of the Securities Exchange Act of 1934, 18 U.S.C. § 78t(a).

Plaintiff has moved to modify the discovery stay imposed under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) ("PSLRA"). Defendants, in turn, have moved to dismiss the Amended Consolidated Complaint (the "Complaint") for failure to state a claim upon which relief may be granted under Rule 12(b)(6), Fed. R. Civ. P., and for failure to satisfy the pleading requirements of Rule 9(b), Fed. R. Civ. P., and the PSLRA. For the reasons set forth below, defendants' motion is granted without prejudice to plaintiff filing an amended complaint and plaintiff's motion is denied as moot.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *Gen. Elec. Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957); *Kennedy* v. *Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke* v. *City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996).

In addition to the mandates of Rule 12(b)(6), Federal Rule of Civil Procedure 9(b) requires "all averments of fraud" to be "stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." "The rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994); *see also DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ("Although states of mind may be pleaded generally [under Rule 9(b)], the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."). "'Because only a fraction of financial deteriorations reflects fraud,' . . . plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors." *Arazie* v. *Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993) (quoting *DiLeo*, 901 F.2d at 628).

Further, in addition to Rule 9(b), the PSLRA imposes "heightened pleading requirements." *Johnson* v. *Tellabs, Inc.*, 303 F. Supp. 2d 941 at 951 (N.D. Ill. 2004). In order to satisfy the PSLRA's dictates for claims of securities fraud, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). If the complaint fails to meet this requirement under the PSLRA, the court, "shall, on a motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A).

## ALLEGATIONS OF THE COMPLAINT[1]

### I.      Background

CEC is a provider of private, for-profit post-secondary education with 78 campuses throughout the United States, Canada, France, the United Kingdom and the United Arab Emirates. (Am. Compl. at ¶ 2, hereinafter, "¶ ___"). CEC owns and operates schools in the fields of visual communication and design technologies, information technology, business studios, culinary arts, and health education. (¶ 2). CEC is a Delaware corporation with its principal place of business in

---

[1] The facts in this section are taken from the Complaint and CEC's Form 10-K for the fiscal year that ended December 31, 2002 and filed with the Securities Exchange Commission ("SEC") on March 7, 2003 ("2002 Form 10-K"), which was attached to defendants' motion to dismiss. The Court may "examine documents that a defendant attached to a motion to dismiss ... if they are referred to in plaintiff's complaint and are central to her claim."*Albany Bank & Trust Co.* v. *Exxon Mobil Corp.,* 310 F.3d 969, 971 (7th Cir. 2002). Although the 2002 Form 10-K was not attached to the Complaint, it was referred to therein and central to plaintiff's claims. The Court also may take judicial notice of SEC filings without converting a motion to dismiss to a motion for summary judgment. *Stavros* v. *Exelon,* 266 F.Supp.2d 833 at 844 n.8 (N.D. Ill. June 13, 2003). The court will disregard the other exhibits attached by plaintiff in his response to defendants' motion to dismiss and the other exhibits attached by defendants to their motion to dismiss because these materials were not referenced in the Complaint. *See Travel All Over the World, Inc.* v. *Kingdom of Saudi Arabia,* 73 F.3d 1423, 1430 (7th Cir. 1996) ("[I]f the district court considers matters outside the pleadings in connection with a motion to dismiss, it must treat the motion as one for summary judgment."). These exhibits include plaintiff's response exhibits A, B, C, D, E, and F, surreply exhibits A and B, and defendants' exhibits B and C.

Hoffman Estates, Illinois. During the Class Period, defendants Larson and Pesch ("individual defendants") were executive officers of CEC. Larson served as CEC's Chief Executive Officer, President and Chairman of the Board. (¶ 17). Pesch served as CEC's Chief Financial Officer, Treasurer and Secretary. (¶ 18).

CEC's business is highly regulated by federal, state and private accrediting agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS"). (¶ 3). Many of CEC's students in the U.S. and Canada participate in government-sponsored financial aid programs, which results in the imposition of extensive regulatory requirements by government funding agencies and other bodies. (¶ 78). Because CEC derives a significant portion of its revenue from students involved in the U.S. federal student financial aid programs administered by the U.S. Department of Education ("DOE"), CEC must maintain its authorization from appropriate state agencies, its accreditation by an accrediting agency recognized by the DOE, and its DOE certification. (¶ 79). In addition, CEC is subject to compliance reviews, claims of non-compliance, and lawsuits by government agencies as a result of the government regulations. *Id.* CEC's business and stock price depends upon its compliance with these regulations and its accreditation and reputation with students and employers. (¶ 3).

## II.    CEC's Alleged Improper Practices

Relying on interviews with thirteen CEC employees, the Complaint alleges that CEC

> engaged in a pervasive practice and pattern which consisted of (a) falsifying student records in order to obtain aid monies and portray CEC schools as having increasing attendance and revenue to garner the favor of the investing public and (b) manipulating CEC schools' financial statements in order to artificially inflate revenue, lower bad debt reserves, and to avoid cessation of funding from financial aid sources.

4

(¶ 33). The Complaint asserts that, by failing to disclose such practices, CEC made materially false and misleading statements when publicly touting its business and financial performance, the performance of its stock price, and its position as an industry leader. (¶ 4). Moreover, the Complaint alleges that CEC grounded its reports of strong growth in these practices, thereby rendering false and misleading CEC's reported historical financial performance and projections of future growth. *Id.*

In support of these allegations, plaintiff relies on information provided by thirteen witnesses. For example, according to Witness 1, CEC had two critical metrics for measuring its success: (1) overall enrollments, the number of students that pay an application fee, and (2) the number of "starts," the number of students who show up for classes on the first day and remain in school until the "Add/Drop" date. (¶ 37). Witness 1 asserts further that the Add/Drop date "should be about five days from the first day of class," but "[t]here was considerable flexibility at CEC schools when the Add/Drop date was actually enforced. . ." *Id.* This flexibility allowed schools to add additional students if starts for a particular period fell below the goal even if it meant that the newly added students missed the first two weeks of classes. *Id.*

In addition, the Complaint cites to the admissions of former CEC employees, including Witnesses 1, 2, and 3, that "it was very common for a student to start school with only a portion of their aid and loans in place" although students "were supposed to have complete packages of financial aid and loans at the time of enrollment." (¶ 38). This practice allowed CEC to count these students as "starts" without regard to whether these students would obtain funding for the remainder of their tuition. *Id.* The Complaint further claims that "CEC corporate received accurate student status reports from the schools . . . and thus knew that most of the 'starts' were not fully packaged and many would ultimately drop out." *Id.* One witness indicated that CEC should not have counted

5

approximately 4-6% of its students as active students because these students were not attending classes. (¶ 39). This witness "went upon occasion to find 'enrolled' students and would be told by the teacher that the student had never shown up but nonetheless was being counted as an active student." *Id.*

The Complaint cites to numerous other alleged improprieties. For example, CEC reported revenues associated with student job placements for placements that had never taken place, which inflated the schools' revenues. (¶ 40). When CEC failed to collect the revenue associated with these phantom placements, CEC treated the accounts as "bad debt." (¶¶ 40, 70). CEC inflated its post-graduation job placement statistics by counting among its successful job placements students with on-going military service following graduation, students who enrolled in a new CEC programs, and students who independently obtained employment without CEC's assistance. (¶¶ 41, 56). CEC also provided loans to students unable to obtain sufficient funding from other sources to cover their tuition and then recognized that revenue. (¶ 42). On numerous occasions, the school would not notify a government agency that a student had dropped out in order to continue to receive government reimbursements. (¶ 43). In addition, student records were falsified so that the school would continue to receive and keep government funds, to build the student population, and to satisfy the compliance auditors. (¶¶ 43-48, 66).

With regard to the individual defendants, the Complaint alleges that Larson and Pesch closely questioned the school officials if a school failed to meet performance goals. (¶ 50). Both Larson and Pesch "received accurate 'non-scrubbed' data about the financial and packaging of each and every enrolled and prospective student, as well as 'scrubbed' (*i.e.* inaccurate) data about the same students." (¶ 51). Larson and Pesch periodically participated in weekly conference calls with one

CEC school in which corporate personnel would instruct school officials to "do whatever it takes" to meet goals. (¶ 62). One witness also reported that she made a presentation at a shareholder meeting during which she characterized the information regarding the number of students enrolled, admitted, and attending classes in her division as not being entirely accurate because of her awareness that certain students included among the number of attending students had dropped out. (¶ 52). After this presentation, the witness was told that Larson was furious with her for not being "more affirmative" in reporting the numbers and that this witness would no longer be allowed to report results. *Id.*

The Complaint also details numerous alleged improper accounting practices of defendants, including the practice of admitting students whose financial aid packages were incomplete or insufficient to cover tuition costs. (¶ 57). Although CEC sends its past due accounts, those accounts in which no payment had been received within 90 days, to a third-party collection agency, it deems an account "current" if any payment of any amount is made during that 90-day period. (¶ 58). If CEC gave a student account to a collection agency and the student made a payment of any amount to the collection agency, the student's account would return to CEC as an active account. (¶ 68). According to the Complaint, an approach consistent with Generally Accepted Accounting Principles ("GAAP") would have been to either add 50%-75% of the total amount due to the bad debt expense or to consider the entire amount uncollectable. (¶ 58).

The Complaint further alleges that one of CEC's schools hired four employees in December 2002 to contact students who had dropped out in order to collect minimal payments of $40 or $50 per person so that their accounts could be considered "current" but did not establish payment plans with these students. (¶ 60). As a result of such practices, CEC's bad debt expense was "critically

7

understated." (¶¶ 63-64). In another incident occurring at the end of 2002, one witness claims to have seen the president of a CEC school present a "wad of cash" to the employees collecting on student accounts and instruct these employees to apply the money to past-due accounts in order to include the accounts among the current accounts. (¶ 66). One witness was told to "fudge numbers and make up stuff." (¶ 70). Another witness indicated that it was an official policy to coax students who had not attended classes in more than thirty days to sit in class in order to collect that student's financial aid money. (¶ 71).

On November 11, 2003, an article in the *Bergen Record*, a local New Jersey newspaper, reported that a former director of CEC's Gibbs College had filed a wrongful termination suit against CEC in which she alleged that the school routinely conferred degrees on students who had not completed required courses or attended mandatory internships. (¶ 116). In response, CEC issued a press release on November 17, 2003 in which it denied the allegations. (¶ 117). CEC's stock price fell from $52.70 per share on November 14, 2003 to $42.56 per share on November 18, 2003. *Id.* The stock price rebounded over the next few weeks. *Id.*

On December 3, 2003, however, *Bloomberg News* reported that the former registrar of CEC's Brooks Institute of Photography had filed a complaint with ACICS alleging that the school falsified student records to ensure that the school passed accreditation inspections and to increase enrollment. (¶ 118). The following day, December 4, 2003, *TheStreet.com* quoted the former registrar as stating that "officials at the school acted illegally and improperly to inflate enrollment and boost bottom line." *Id.* Again, CEC's stock price fell from $54.76 per share on December 2, 2003 to $39.48 on December 3, 2003. (¶ 119). The SEC launched an investigation into the allegations raised by CEC's former employees in early 2004. (¶ 120).

8

### III.    Alleged False and Misleading Statements

The Complaint alleges that CEC made numerous false and/or misleading statements and omissions on its website and in its press releases, SEC filings, and conference calls concerning its business and financial performance, the performance of its stock price, and its position as an industry leader.  The alleged false and misleading statements fall within two primary categories: (1) CEC's statements concerning the number of starts, its student population, and its post-graduation job placements; and (2) CEC's disclosures concerning its net revenues, accounts receivable, and bad debt reserves expense.  For the sake of clarity, the court addresses each category in turn.

*A.    The Number of Starts, the Student Population, and Post-Graduation Job Placements*

Plaintiff alleges that defendants made numerous false and misleading statements during the Class Period in CEC's press releases and SEC filings, as well as on CEC's website.  For the most part, these statements encompass CEC's assertions regarding its success in terms of the number of starts, the student population, and its success in placing students in jobs following graduation.  In a press release issued on January 28, 2003, CEC announced that January 2003 new student starts rose twenty-eight percent from the same period the year before, and fourth quarter 2002 starts rose eighteen percent.  (¶ 73).  CEC expected that the total student population on January 31, 2003 would have risen approximately 21% from the year before, to approximately 51,100 students.  *Id.*  In its 2002 Form 10-K, CEC confirmed the enrollment numbers reported by the January 28, 2003 press release.  (¶ 77).  The 2002 Form 10-K also detailed the financial aid arrangements and corresponding regulations, in addition to a number of risk factors.  (¶¶ 78-79).

CEC subsequently issued a press release on April 22, 2003.  (¶ 83).  With regard to the number of new starts and overall student population, the press release stated:

9

> First quarter 2003 new starts rose 38 percent to approximately 14,600, up from approximately 10,550 for the same period last year. The INSEEC Group, that was acquired on February 18, 2003, did not have new student starts during CEC's period of ownership in the first quarter.
>
> Total CEC student population on April 30, 2003 is expected to be approximately 54,400, up 33 percent from approximately 40,800 on April 30, 2002. On a same school basis, student population is expected to show an increase of approximately 21 percent during these periods.

(¶ 84). Defendant Larson also provided a statement in the press release in which he announced a definitive merger agreement with the Whitman Education Group, Inc. and lauded the reputation and growth of the CEC schools. (¶ 86). Press releases issued by CEC on July 22, 2003 and October 21, 2003 similarly announced increases in student starts and total CEC student population and included statements by defendant Larson discussing the growth and results of the CEC schools. (¶¶ 95, 97, 105, 107).

CEC also maintained a website in which it discussed the various reasons to invest in CEC in a page entitled, "Why Invest in CEC." (¶ 114). Among the various reasons, CEC noted "five key reasons," including its role as a "growth leader in a growth market," the "proven success" of its growth strategy, its entry into the on-line education field; and its range of education options. (¶ 114). In addition, CEC explained that its

> demonstrated operational excellence creates a strong competitive advantage that is reflected in: marketing programs that continue to attract students in record numbers from all segments of the potential student population; career-focused educational programs that prepare graduates for successful careers in attractive, high-growth fields; innovative retention programs that help make sure students complete their education; and a graduate placement record that consistently ranks among the industry leaders.

*Id.*

*B.    CEC's Financial Statements*

Because of CEC's alleged improper business practices, plaintiff asserts that CEC overstated its revenue and accounts receivables and understated its bad debt reserves expense during the Class Period.  In support, plaintiff points to the statements concerning CEC's net revenue, accounts receivables, and bad debt expense reserves contained in CEC's press releases of January 28, 2003, April 22, 2003, July 22, 2003, and October 21, 2003; in its SEC filings for the fourth-quarter and year-end 2002, first quarter 2003, second quarter 2003, and third quarter 2003; and in its 2002 Form 10-K.  *See* ¶¶ 72, 74, 77, 83, 85-86, 89, 91, 94, 96, 98, 100, 102, 104, 106-108, 110, 112.  These statements specify the amount of CEC's net revenue, accounts receivables, and bad debt expense reserves for the specific periods referenced or affirm the financial results announced in other statements or filings.

The Complaint quotes each alleged false and misleading material statement, identifies the document in which it was contained and the date of the document, identifies the speaker/author, and lists why such statements were materially false and misleading.  After each statement, the Complaint states that the representations failed to disclose material adverse facts, including:

> (a)    during the Class Period, CEC has systematically falsified student records in order to increase graduation and enrollment rates and to conceal problems to help its schools pass audits conducted by the ACICS and the U.S. Department of Education, among other agencies;

> (b)    a material portion of [CEC's] reported revenues were improperly recognized because they were derived through fraudulent business practices, such as federal grants and financial aid payments made based on records and representations that were falsified by [CEC];

> (c)    [CEC's] reported results did not accurately portray [CEC's] operations because a material portion of those results were attributable to improper accounting practices;

11

(d)     [CEC's] allowance for doubtful accounts and bad debt expense were derived from improper accounting practices;

(e)     contrary to statements in its press releases, [CEC's] success was not attributable solely to the supposed strength of its business or its supposed competitive advantages, but rather, a material portion of its results were attributable to fraudulent and prohibited business practices;

(f)     [CEC's] purported risk warnings failed to disclose that [CEC] had falsified student records and defrauded the federal, state and private agencies which regulate and/or accredit CEC's schools, thereby placing its accreditation at serious risk and jeopardizing the ability of its students to qualify for financial aid, which would have a devastating impact on CEC's business; and

(g)     [CEC's] results were not prepared and reported in accordance with GAAP and did not fairly present its actual financial results or condition.

(¶¶ 76, 92, 103, 113).

## IV.   Plaintiff's[2] Investment in CEC

Because of CEC's materially false and misleading statements, as well as CEC's failure to disclose material facts necessary to make its statements not false and misleading, plaintiff alleges that CEC's common stock traded at artificially high prices during the Class Period. (¶ 149). Plaintiff and the other members of the putative class purchased CEC's common stock at its artificially inflated prices, which resulted in their losses when the market accurately valued CEC. (¶ 151).

In Count I of the Complaint, plaintiff contends that defendants violated Rule 10b-5 by knowingly or recklessly employing devices, schemes and artifices to defraud; by making untrue statements of material fact and/or omitting to state material facts necessary to make the statements not misleading; and by engaging in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of CEC's securities in an effort to maintain artificially high

---

[2]"Plaintiff" refers to the lead plaintiff and the putative class.

market prices for CEC's securities. As a result of such conduct, plaintiff alleges that he suffered

damages in connection with his purchase and sale of CEC's securities. In asserting this claim,

plaintiff relies on the fraud-on-the-market doctrine, which presumes that the market price of a

company's stock reflects all publicly available information about the company. In Count II, plaintiff

alleges that the individual defendants, as "controlling persons" of CEC, violated Section 20(a) of the

Exchange Act. Defendants have moved to dismiss both counts of the Complaint.

## DISCUSSION

### I.    Count I: Section 10(b)

Section 10(b) of the Securities Exchange Act of 1934 provides,

> It shall be unlawful for any person, directly or indirectly, by the use of any
> means or instrumentality of interstate commerce or of the mails, or of any
> facility of any national securities exchange . . . [t]o use or employ, in
> connection with the purchase or sale of any security . . . [,] any manipulative
> or deceptive device or contrivance in contravention of such rules and
> regulations as the [Securities and Exchange] Commission ["SEC"] may
> prescribe as necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. §§ 78j(b). Pursuant to this section, the SEC promulgated Rule 10b-5, which makes it

unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue
> statement of a material fact or to omit to state a material fact necessary in order to
> make the statements made, in light of the circumstances under which they were
> made, not misleading, or (c) [t]o engage in any act, practice or course of business
> which operates or would operate as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. § 240.10b

To establish liability under § 10(b) and Rule 10b-5, a plaintiff must prove that "(1) the

defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection

with the purchase or sale of securities (5) upon which plaintiff justifiably relied (6) and that the false statement proximately caused plaintiff's damages." *Caremark, Inc.* v. *Coram HealthCare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997); *Searls* v. *Glasser*, 64 F.3d 1061, 1066-67 (7th Cir. 1995). In support of their motion to dismiss, defendants argue that plaintiff failed to plead sufficient facts to show that CEC's public statements were false or misleading.

### A. Pleading on Information and Belief

Defendants contend that plaintiff based his fraud allegations solely on "information and belief" drawn from interviews between plaintiff's counsel and thirteen unnamed, former CEC employees and two newspaper articles. Because the allegations are based on information and belief, defendants argue that plaintiff must identify the witnesses "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." (Defendants' Memorandum of Law in Support of Their Motion to Dismiss at P. 18, quoting *Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

The allegations in the Complaint are based upon counsel's interviews with thirteen former CEC employees. *See* Lead Plaintiff's Opposition to Defendants' Motion to Dismiss at P. 19. *See also* ¶32. Because these allegations are based on the investigation of counsel, plaintiff must assert facts with the same particularity as if the claims were based on information and belief. *See Adams* v. *Kinder-Morgan, Inc.*, 340 F.3d 1083 at 1098 (10th Cir. 2003) ("The Court has reviewed the cases on point and agrees with those that hold that allegations based on the investigation of counsel are the equivalent of allegations based on information and belief."); *Johnson*, 303 F. Supp. 2d at 952-53 ("This Court rejects Plaintiffs' position and finds that allegations based upon counsel's investigation must state facts with the same particularity as if the claims were based on information and belief.").

14

Defendants argue further that the allegations in the Complaint fail to establish that the thirteen witnesses held positions within CEC in which they would have access to CEC's corporate practices with regard to student populations statistics or the preparation of CEC's financial statements. In response, plaintiff argues that this court should decline to follow defendants' "divide and discard strategy" because the allegations are to be considered in the aggregate rather than in isolation. (Lead Plaintiff's Opposition to Defendants' Motion to Dismiss at P. 20). Plaintiff's contention, however, ignores the court's obligation to "assess the reliability of each source's information based, in part, on the confidential source's position at [CEC], the time period in which he held such a position, his access to information and whether the allegations are based on his personal belief." *Johnson*, 303 F. Supp. 2d at 952.

One deficiency of plaintiff's pleading raised by defendants is that some of the witnesses are alleged to have worked at CEC during only a portion of the Class Period.[3] According to the

[3] The witness' alleged employment with CEC is summarized in the chart below.

| Witness | Employment with CEC |
|---|---|
| 1 | Controller/Finance Vice President for one of the Gibbs Schools in the mid-Atlantic region for only a portion of the Class Period. ¶ 21. |
| 2 | Finance Manager at one of the CEC schools in the Northeast for a portion of the Class Period. ¶ 21. |
| 3 | Director of Tuition Planning and Admissions at one of CEC's culinary schools in the Northeast during the early part of the Class Period. ¶ 38. |
| 4 | Director of Financial Aid at one of the CEC schools in the Southeast during part of the Class Period. ¶ 38. |
| 5 | Director of Career Serves at a CEC school in the Northeast. ¶ 40. |
| 6 | Employer Relations Manager employed by CEC corporate during part of the Class Period. ¶ 41. |
| 7 | Director of Admissions at a CEC school in the Northeast for nine years. ¶ 45. |
| 8 | Admissions Representative at a CEC school in the Midwest prior to and throughout the Class Period. ¶ 47. |
| 9 | Regional Director of Admissions at CEC's corporate headquarters in Hoffman Estates. ¶ 50. |
| 10 | Student Services representative at a CEC school in the Midwest. ¶ 54. |
| 11 | Director of Career Services at a CEC school in California during the Class Period. ¶ 56. |
| 12 | Vice President of Finance at a CEC school in the Mid-Atlantic region for part of the Class Period. ¶ 59. |
| 13 | Finance Manager employed at a CEC school in the Northeast during the Class Period. ¶ 62. |

Complaint, Witnesses 1, 2, 3, 4, 6, and 12 were employed by CEC for only a portion of the Class Period. ¶¶ 21, 38, 41, 59. Defendants assert that is unlikely that an employee who worked for CEC for only a portion of the Class Period would know how the school in which he was employed reported on its statistics or how CEC corporate handled such statistics or disclosed such statistics. Defendants further argue that the information provided by Witnesses 5, 7, and 9 is unsubstantiated because plaintiff failed to allege that they were employed by CEC during the Class Period. Defendants also argue that plaintiff failed to allege any facts suggesting how Witness 8, a former Admissions Representative, had access to information concerning his school's receipt or handling of government loan monies, much less information pertaining to how other CEC schools or CEC corporate handled or reported on such monies. Moreover, defendants note that plaintiff failed to allege the time period in which the instances of alleged falsification of student statistics concerning the student population, graduation, or post-graduation job placement occurred. As a consequence, defendants argue that it is impossible to know whether the allegations of misconduct affected any of CEC's public statements during the Class Period.

While the court agrees with plaintiff that it is not necessary for the defendants to have employed a witness for the entire Class Period in order for that witness' statement to be relevant or reliable, plaintiff nonetheless must show that the witnesses had access to the information in order for the court to assess the reliability of the witnesses' statements. *Johnson*, 303 F. Supp. 2d at 952. As evidenced above, plaintiff has not adequately pled that all of the alleged misconduct occurred and affected CEC's financial disclosures and reports on student statistics during the Class Period. For example, plaintiff did not allege when CEC pushed out the Add/Drop date in order to reach its goal

of student starts,[4] or when CEC should not have counted 4-6% of students as active students,[5] or when CEC collected revenue for student placements that had not occurred.[6] In fact, paragraphs 38, 47, 49, 54-56, 59-601 64-65, and 71 of the Complaint contain the only allegations of a specific time period for the alleged misconduct that affected CEC's financial disclosures during the Class Period. Although it may not be necessary for plaintiff to plead specific dates in each paragraph of the complaint, it is necessary for plaintiff to allege misconduct that affected CEC's public statements during the relevant Class Period and of which the witnesses had knowledge, particularly where, as here, many of the witnesses were not employed during the entire Class Period. The fact that some CEC schools or CEC employees at some point in time engaged in the alleged misconduct does not satisfy plaintiff's obligation under the heightened pleading requirements of Rule 9(b) and the PSLRA. Thus, the court will consider only the allegations of misconduct that plaintiff alleged to have occurred and/or affected CEC's disclosures during the Class Period.

Plaintiff alleges that during the quarter in which July 2003 fell, 273 students "started" at Witness 4's school when only 35 students were fully packaged and that "many" of these students eventually dropped out. (¶ 38). Plaintiff did not quantify how "many" of the students dropped out. According to Witness Eight, her school counted students who had dropped out as current and kept the government monies it received, which entitled the school to obtain an "A-Team" designation for 2003. (¶ 47). In 2004, Witness Eight's school began returning the government money in advance

---

[4]*See* ¶ 37.

[5]*See* ¶ 39.

[6]*See* ¶ 40.

of a major accreditation audit. (¶ 49). Witness Eight believed that approximately fifty student files, amounting to as much as $2,000 to $3,000 per student, had to be refunded. *Id.*

According to Witness 10, "there was a push in 2003 to increase starts to meet objectives." (¶ 54). This led to the admittance of "special needs" students, an illiterate student, one student who performed at a 7th grade level, and another student who performed at a 4th grade level. *Id.* "Various poor quality students" also were admitted, including felons, homeless persons, and drug addicts. Witness 10 also believed that the student body count in her school was officially about 775 students at the end of 2003; however, only about 650 students were actively attending classes. (¶ 55). Witness 10 further reported that, in 2003, Student Services representatives were told to call students to "coax" them to sit in classes so that the school could collect their financial aid money for the period. (¶ 71). Witness 10 did not specify how many students were telephoned or how many were "coaxed" into sitting in classes. Witness 10 stated that the "official" policy was to drop students if more than thirty days had passed from the date of the student's last recorded attendance. *Id.* Witness 10 did not state whether the "official" policy was CEC's, her school's, or a general policy followed by schools.

Witness 11 maintains that the president of the school in which she was employed directed his executive assistant to call graduates in approximately September of 2003 to offer them $50 and a shirt in exchange for information on their employment. (¶ 56). This allowed the school to claim credit for the graduates' placement, despite having provided no services for the placement, and increased the placement rate from 69% to 85%. *Id.*

Witness 12 stated that CEC's practice of setting up payment plans to cover unpackaged tuition costs led to a significant problem with bad debt reserves expense because "many" students

would drop out owing money to CEC. (¶ 59). Witness 12 did not quantify how "many" students dropped out under these circumstances. At the end of 2002, Witness 12's school significantly understated its bad debt reserves expense because if a student made a minimal payment, it was counted as a current account. *Id.* Witness 12's school also hired four people in December 2002 to contact students who had dropped out in order to collect minimal payments of $40 or $50 per person so that their accounts could be considered current but did not establish payment plans with these students. (¶ 60).

Similarly, Witness 13 stated that his school under-reported its bad debt reserves expense. (¶64). In his opinion, the reported bad debt reserves expense of approximately $50,000 - $60,000 should have been at least ten times higher because "many" of the accounts shown as current were never going to be collected. *Id.* Witness 13 did not specify how many of the accounts were never going to be collected. Witness 13 also witnessed the president of his school present a "wad of cash" to personnel attempting to collect on student accounts with instructions to apply the money to past-due accounts that they had unsuccessfully tried to collect so that they could count those accounts as current. (¶ 65).

### B.    *Sufficiency of Plaintiff's Allegations*

Defendants contend that plaintiff failed to meet the heightened pleading standard imposed under the PSLRA, which requires that a plaintiff "specify" the reasons a defendant's statement is false. 15 U.S.C. § 78u-4(b)(1)(B). Defendants argue that the problems identified by plainitff's witnesses do not show "how" or "why" CEC's public statements were false or misleading. Defendants assert that plaintiff's claims provide no concrete facts that quantify the operational or financial impact of any of the alleged misconduct on CEC.

19

Plaintiff counters, however, that the fact that numerous former CEC employees at different CEC schools throughout the country reported similar facts about CEC's desire to report increasing student start and population numbers and the improper means by which the schools inflated those numbers, as well as the similar facts concerning CEC's overstatement of accounts receivables and bad debt reserves expense at different CEC schools, leads to the reasonable inference that such practices are not isolated but strong evidence of a company-wide, fraudulent scheme.

Plaintiff argues further that he is not required to quantify the revenue overstatement in order to successfully plead a Rule 10(b) violation. This argument, however, fails to recognize the distinction between the court's need for more quantifiable details relating to the witnesses' allegations of CEC's revenue overstatement, as well as CEC's statistics relating to the number of starts, its student population, and job placements, and the requirement that plaintiff state the amount by which CEC's financial statements were in error. *See Danis* v. *USN Communs., Inc.*, 73 F. Supp. 2d 923, 935 n.6 (N.D. Ill. 1999) (noting that plaintiffs need not state amount by which defendant's financial statements were in error where "most of this information is in the hands of the defendants . . . and plaintiffs have satisfied their burden at this stage in the litigation.") (citations omitted). Here, the issue is whether plaintiff has met his pleading burden under the heightened requirements for pleading on information and belief. In order to resolve this issue, the court must assess the reliability of the witnesses' allegations. *See Johnson,* 303 F. Supp. 2d at 952. The witnesses' ability to quantify or provide detail about their allegations is directly relevant to the court's determination of whether the witnesses had access to the information and whether the allegations are based on their personal beliefs rather than rumor. *See id.*

20

Taking the well-pled allegations as true, CEC under-reported its bad debt expense reserves by accepting minimal payments to accounts and applying cash to accounts in order to classify those accounts as current even though attempts to collect on those accounts had been unsuccessful. These allegations, however, only pertain to two schools out of more than seventy campuses. Moreover, neither Witness 12 nor Witness 13 provided any quantifiable basis for their assertions that their schools under-reported their bad debt expense reserves. While both witnesses discussed allegedly improper collections practices on the part of their schools, neither witness offered any information as to the number of accounts or students allegedly affected by these practices apart from Witness 13's speculation that his school's bad debt expense reserves of approximately $50,000 - $60,000 should have been at least ten times higher. (¶ 64). Plaintiff, instead, relies upon vague verbiage, such as "many of the accounts,"[7] or simply "students"[8] or "accounts."[9] Without more information, the court cannot adequately assess the reliability of the witnesses' statements. *See Johnson* at 952.

Plaintiff also argues that the court should draw the reasonable inference that the under-reporting of the schools' bad debt expense reserves was company-wide, but this argument mischaracterizes the pleading burden under Rule 9(b) and the PSLRA. *See Arazie*, 2 F.3d at 1465 ("[P]laintiffs must provide enough detail about the underlying facts which illustrate that the firm's public statements were fraudulent to allow the court to evaluate the claim in a meaningful way."). In any event, the court finds that it is unreasonable to infer, based on the well-pled allegations that the under-reporting of two schools' bad debt expense reserves is also attributable to a significantly

---

[7] ¶ 64.

[8] ¶¶ 60, 64.

[9] ¶¶ 60, 64.

21

larger number of CEC's schools. Thus, the court cannot determine how the under-reporting of the bad debt expense reserves at the two schools affected CEC's public statements, if at all. Similarly, Witnesses 8, 10, and 11 do not provide a sufficient basis for the court to infer reasonably that the conduct they alleged, even if improper, was company-wide. Even considering these witnesses' claims in the aggregate, the allegations of these witnesses fail to raise the reasonable inference that CEC's public statements were false or misleading. *See Johnson*, 303 F. Supp. 2d at 952. Because plaintiff failed to meet the heightened pleading burden under Rule 9(b) and the PSLRA, the court grants defendants' motion to dismiss count one of the Complaint.[10]

Plaintiff previously asked for, and was granted, leave to file the Complaint. Thus, this is the court's first opportunity to examine the merits of plaintiff's allegations. Given that the court is not certain that no securities fraud action may lie under the factual scenario presented here, plaintiff will be afforded one more chance to state a securities fraud claim.

## II.     Count II: Section 20(a)

This claim's survival depends on whether plaintiff's complaint adequately states a claim under § 10(b) and Rule 10b-5. *See In re Allscripts, Inc. Secs. Litig.*, No. 00 C 6796, 2001 WL 743411, at *12 (N.D. Ill. June 29, 2001) ("If a Complaint does not adequately allege an underlying violation of the securities law . . . the district court must dismiss the section 20(a) claim."). Plaintiff has failed to state a claim against CEC. Accordingly, their controlling person claims against the individual defendants are dismissed.

---

[10] In light of the court's finding that plaintiff failed to meet the heightened pleading burden under Rule 9(b) and the PSLRA, the court finds it unnecessary to decide whether plaintiff sufficiently pled the scienter necessary to establish securities fraud.

### III.  Motion to Modify Discovery Stay

Plaintiff has moved to lift the PLSRA's discovery stay in order to allow him to obtain copies of the documents that defendants produced to the SEC and the U.S. Department of Justice in connection with investigations by both government agencies into the same facts and circumstances alleged in Plaintiff's Complaint.  Because the court has granted the defendants' motion to dismiss, however, plaintiff's motion to modify the discovery stay is denied as moot.

### ORDER

For the reasons stated above, defendants' Motion to Dismiss [#31] is granted without prejudice.  Plaintiff may file an amended complaint within twenty-eight days (March 11, 2005). Plaintiffs' Motion to Modify the Discovery Stay [#40] is denied as moot.

ENTER: _____

JOAN HUMPHREY LEFKOW

United States District Judge

Dated: February 11, 2005