# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

|   |   |   |
|---|---|---|
| IN RE CAREER EDUCATION CORPORATION SECURITIES LITIGATION | ) ) ) ) | No. 03 C 8884<br>Judge Joan H. Lefkow |

## MEMORANDUM OPINION AND ORDER

In this securities fraud action, the court previously dismissed Lead Plaintiff Thomas Schroder's[1] amended consolidated complaint against defendants Career Education Corporation ("CEC"), John M. Larson, and Patrick K. Pesch (collectively, "defendants") but afforded plaintiff one more opportunity to state a claim for securities fraud. On April 1, 2005, plaintiff, individually and on behalf of a putative class of purchasers of CEC securities between January 28, 2003 and February 15, 2005 (the "Class Period"), filed a 287-paragraph, 102-page Second Amended Consolidated Complaint ("SAC"), alleging violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and the Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. Defendants now move to dismiss the SAC for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., and for failure to satisfy the pleading requirements of Rule 9(b), Fed. R. Civ. P., and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. Plaintiff has moved to modify the discovery stay. For the reasons stated below, the court grants defendants' motion to dismiss and denies plaintiff's motion to modify the discovery stay as moot.

---

[1] For clarity, the court will refer collectively to Lead Plaintiff Thomas Schroder and the purported class as "plaintiff."

## DISCUSSION[2]

In the SAC, plaintiff contends that defendants violated § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 by making false and misleading statements and omissions on CEC's website and in its press releases, SEC filings, and conference calls concerning CEC's business and financial performance, the performance of its stock price, and its position as an industry leader. This claim is premised on a fraud-on-the-market theory, which asserts that defendants' fraudulent statements and omissions artificially inflated the market price of CEC's common stock and that plaintiff suffered injury when the stock that he purchased at the inflated price dropped after the truth became known to the market. Plaintiff also asserts the derivative claim that the individual defendants violated § 20 of the Securities Exchange Act because they exercised power as "control persons" to cause CEC to engage in illegal practices.

"To state a valid Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a statement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re Healthcare Compare Corp. Securities Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). The allegedly false and misleading statements and omissions made by defendants during the Class Period fall into two general categories: (1) student population and job placement figures; and (2) CEC's historical financial results. The SAC identifies each statement, who made each statement, when the statement was made, where the statement was made, and, based on the substantive

---

[2]The court assumes the parties' familiarity with the background facts of this case. Rather than repeating these facts, the court refers both parties to its memorandum opinion and order granting defendants' motion to dismiss plaintiff's Amended Complaint. *Taubenfeld v. Career Education Corp.*, No. 03 C 8884, 2005 WL 350339, at *13 (N.D. Ill. Feb. 11, 2005) ("Taubenfeld I").

2

allegations alleged earlier in the SAC, states that each of these statements is false and misleading. *See* SAC ¶¶ 154-252.

As in their previous motion to dismiss, defendants argue that plaintiff has failed to meet his pleading burden under Rule 9(b), Fed. R. Civ. P., and the PSLRA by failing to plead fraud with particularity. Specifically, defendants contend that plaintiff has failed to plead sufficient facts (1) to show that his twenty-two confidential witnesses had reliable information regarding defendants' alleged fraud; (2) to show that CEC's public statements were false or misleading; or (3) to raise a strong inference of defendants' scienter. Defendants further contend that plaintiff lacks standing to assert claims about alleged misrepresentations that occurred after plaintiff's last purchase of CEC stock. Finally, defendants argue that because plaintiff has failed to allege a predicate violation of § 10(b), plaintiff's § 20(a) claims against the individual defendants must be dismissed.

In response, plaintiff again argues that the court is to consider the totality of the allegations rather than dissecting each allegation as if it were standing alone. *See* Plaintiff's Opposition Brief at 11. This argument puts the cart before the horse. Before the court draws any inferences, plaintiff must first meet the pleading requirements of the PSLRA, which requires that the complaint allege with specificity the statements that were false or misleading, the reasons why these statements were false or misleading, and if pleading on information and belief, what specific facts support that information and belief. *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006); *City of Austin Police Retirement System v. ITT Educational Servs., Inc.*, 388 F. Supp. 2d 932 at 945 (S.D. Ind. 2005) (stating that "[a] court cannot aggregate allegations relying on confidential witnesses' testimony that have not been pleaded with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information

3

alleged.") (citation and internal quotations omitted). Only after the court determines which allegations are well-pled does the court draw any inferences in favor of plaintiff.

## I. Plaintiff's Standing

Before deciding whether the allegations in the SAC are well-pled, the court must determine which claims the plaintiff has standing to assert. Defendants argue that the named plaintiffs, who premise their securities fraud claim on a fraud-on-the market theory, lack standing to bring a Rule 10b-5 claim based on statements allegedly made after plaintiffs last purchased CEC stock. In dealing with this precise issue, the Seventh Circuit has affirmed the dismissal of a Rule 10b-5 claim that relied on post-purchase statements, holding that "[s]uch post-purchase statements cannot form the basis of Rule 10b-5 liability, because the statements could not have affected the price at which plaintiff actually purchased." *See Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411 at 1420 (7th Cir. 1992), *citing Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 775, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1979) (Rule 10b-5 prescribes only fraud in connection with the purchase or sale of securities). The Seventh Circuit then noted that because plaintiff lacked standing to bring its own claim, plaintiff could not state a claim on behalf of other investors who purchased Lands' End stock after the statements were made. *Id.* at 1420 n.6 ("Having no claim of its own based on the post-purchase statements, [plaintiff] would not be a proper representative of a class of persons who bought Lands' End stock after defendants' allegedly fraudulent . . . statements."). According to the SAC, the last date on which any named plaintiff purchased CEC stock was December 5, 2003. (SAC ¶¶ 15, 16; Exhibits A and B). Therefore, plaintiff was unaffected by any statements made after that date and, as a result, has no standing to assert a Rule 10b-5 claim based on statements made after after December 5, 2003.

4

Relying on *Danis* v. *USN Communications, Inc.*, 189 F.R.D. 391 (N.D. Ill. 1999), plaintiff argues to the contrary that the court must reject defendants' argument based on *Roots*. *Danis*, however, is distinguishable from the present matter because class certification, rather than standing, was at issue in that case. Additionally, while each of the lead plaintiffs in *Danis* did not have standing to pursue all of the claims, taken together, they had standing to pursue every claim. In this case, none of the named plaintiffs purchased CEC securities after December 5, 2003, as such they have no standing to assert claims on behalf of other investors. *Roots*, 965 F.2d at 1420. *See also Davis* v. *SPSS, Inc.*, 385 F. Supp. 2d 697, 706-707 (N.D. Ill. 2005) (Moran, J.) (distinguishing *Danis* and holding that named plaintiffs did not have standing to state a Rule 10b-5 claim based on post-purchase statements); *Ong ex rel. Ong IRA* v. *Sears, Roebuck & Co.*, 388 F. Supp. 2d 871, 896 (N.D. Ill. 2004) (Pallmeyer, J.) ("The court is bound by Seventh Circuit precedent on this issue and, in any event, finds the rationale of *Roots* persuasive."); *In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 112 (N.D. Ill. 1996) (Castillo, J.) (following *Roots* to hold that class period could not extend beyond the last stock purchase date). Accordingly, the court will confine its analysis to the statements and events that occurred prior to December 5, 2003.

I.   **The 22 Confidential Witnesses[3]**

In an effort to bolster the allegations in the SAC, plaintiff relies on the summaries of statements made by 22 confidential witnesses, all of whom are former employees of CEC. Many of these allegations suffer from the same fatal defects as those alleged in the ACC: they do not allege with sufficient specificity when the allegedly improper activities occurred, how the witnesses learned

---

[3] Although the complaint refers to twenty-six confidential witnesses, the SAC does not include any statements or allegations attributable to four of these witnesses: Witnesses 14, 15, 19, and 22.

of these activities or had access to this information, or, even ignoring these other deficiencies, how these activities affected CEC's statements and omissions.

The Seventh Circuit recently addressed the issue of whether the identity of the plaintiff's sources necessarily falls within the facts required to support a reasonable belief that the defendant has committed fraud. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006). The court held that while it is not necessary that a plaintiff plead the "name, rank, and serial number" for each of his confidential sources, a plaintiff must "describe [his] sources with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged,' or in the alternative, provide other evidence to support their allegations." *Id., quoting Novak v. Kasaks, Inc.*, 216 F.3d 300 at 314 (2d Cir. 2000) (internal citation omitted). If, however, "the descriptions indicate that the sources would not have access to, or knowledge of, the facts underlying the allegations, the allegations would be insufficient." *Id.*

Except as noted, plaintiff has pled the title, job duties, and dates of employment of many of his confidential witnesses with sufficient particularity to determine the probability that these witnesses would have knowledge of or access to the information about which they have provided statements. These witnesses include a former Controller/Finance Vice President, a former Student Account Manager and Finance Manager, a former Director of Tuition Planning and Admissions, a former Director of Financial Aid, a former Director of Career Services, and a former Director of Admissions. They were employed at various CEC schools around the country.

Plaintiff, however, has not provided any information about the job duties and responsibilities of Witness 11, a former Director of Career Schools at a CEC school in California; Witness 17, a former Retention Coordinator at a CEC school in Texas; Witness 20, a former Vice President of

Academic Affairs at a CEC school in Los Angeles; or Witness 22, a former Program Director of Surgical Technology at a CEC school in Pennsylvania. Nor has plaintiff given any indication of with whom these confidential witnesses interacted or to what information or records they would have had access. The titles of these witnesses also do not provide a clear indication of the witnesses' duties, responsibilities, or other necessary information. As such, the court is unable to determine the probability that these witnesses would have had access to or knowledge of the facts about which they have provided statements or whether they were merely repeating what they had heard from their co-workers or other third parties. *See, e.g.,* SAC ¶ 148 (relating contents of e-mail received by Witness 20 from an unidentified CEC employee after Witness 20 had left CEC's employ).

Additionally, plaintiff has not shown that it was probable that Witness 24, a former Director of Admissions for AIU Online whose duties were related to qualifying prospective students for admission to the Online University, had access to or knowledge of the facts relating to graduate job placement success. There are no allegations as to what information was available to administrators in Witness 24's position. Plaintiff also failed to demonstrate the probability that Witness 23, a former Director of Student Services whose duties included counseling students on academic probation, creating academic plans, and re-enrolling students who had dropped out, or Witness 8, a former Admissions Representative responsible for recruiting new students, had access to information about how their schools or CEC schools generally handled government loan monies. Nor has plaintiff pled allegations establishing the probability that Witness 18, a former CEC Divisional Controller for the Colleges Division who served as a liaison between the schools and CEC corporate and who assumed the controller function for schools that might not have had a controller, had knowledge of how many students at a particular school had submitted proof of high

school graduation. *See In re Metawave Comm. Corp. Sec. Litigation*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) ("Plaintiffs must plead 'with substantial specificity' how confidential witnesses 'came to learn of the information they provide in the complaint.' The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or 'merely regurgitating gossip and innuendo.'") (citations omitted). Each of these witnesses has provided statements that require knowledge beyond the areas of their job duties, and plaintiff has not alleged that such information was available to these witnesses. In the absence of allegations supporting the probability that these witnesses had access to or knowledge of the information about which they have testified, plaintiff has failed to meet his pleading burden under the PSLRA. *See Makor*, 437 F. 3d at 596.

The SAC also shows that there is some confusion as to who Witness 20 is. In SAC ¶ 26(t), Witness 20 is a former Vice President of Academic Affairs at a CEC school in Los Angeles who was employed by CEC from March 2003 to February 2004. By contrast, in SAC ¶ 144, Witness 20 was an instructor for an online course that ended in July 2004. There is no other information as to Witness 20's course or school. According to SAC ¶ 144, the Dean of Academic Affairs advised Witness 20 to allow "all students the opportunity to be successful by accepting work completed at any time during the session," but there are no allegations that Witness 20 did, in fact, accept late work from any student. SAC ¶ 144 states that in one course of 25 students, 12 people never logged on or completed assignments. But there are no allegations as to what happened to or how defendants counted those 12 students. SAC ¶¶ 21(d) and 103 also attribute information regarding Weekly Flash Reports and Packaging Summaries, which were the responsibility of a school's Vice President of Finance, to Witness 20. The facts as alleged, however, are insufficient to establish the probability that either Witness 20 had information about Weekly Flash Reports and Packaging Summaries.

In Taubenfeld I, the court identified specific allegations that failed to meet the heightened pleading requirements under the PSLRA because of their reliance on vague verbiage as to when allegedly improper activities occurred or how many students or student accounts were affected by these activities. The court explained that the witnesses' ability to provide specific details about their allegations is relevant to the court's determination of the probability that these witnesses had access to the information or, instead, whether the allegations were based on rumor. *Taubenfeld*, 2005 WL 350339, at *11, *citing Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941 at 952 (N.D. Ill. 2004). While plaintiff is not obligated to quantify the errors in CEC's financial statements, press releases, etc., *see Danis v. USN Communs. Inc.*, 73 F. Supp. 2d 923, 935 n.6 (N.D. Ill. 1999), plaintiff nonetheless must allege sufficient facts to support a reasonable belief that these statements, press releases, etc. were false or misleading. *See Makor*, 437 F.3d at 595 ("[T]he relevant question is 'whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission'"), *quoting Novak*, 216 F.3d at 314 n.1.

Despite the court's explicit counsel to plaintiff, plaintiff has resubmitted many of the same allegations without correcting their deficiencies. *Compare* Amended Consolidated Complaint ("ACC") ¶ 38 *with* SAC ¶ 129; ACC ¶ 39 *with* SAC ¶ 131; ACC ¶ 40 *with* SAC ¶ 106; ACC ¶ 47 *with* SAC ¶ 126; ACC ¶ 54 *with* SAC ¶ 142; ACC ¶ 55 *with* SAC ¶ 132; ACC ¶ 56 *with* SAC ¶ 117; ACC ¶¶ 60, 64 *with* SAC ¶¶ 35 n.2(6)-2(7); ACC ¶ 71 *with* SAC ¶ 153 n.9. Again, these allegations rely on imprecise terms such as "many," "several," or, even more generically, "students." Such allegations lack the specificity necessary for demonstrating the probability that the witnesses had access to the information about which they provided statements or that these incidents had any effect

9

on defendants' statements and omissions.[4] Additionally, most of these allegations fail to reference a time period for the allegedly improper activities. Since many of the witnesses were employed by CEC for only a portion of the Class Period, plaintiff needed to plead these allegations with more precision such that it would be probable that the allegedly improper activities occurred or affected defendants' statements and omissions during the Class Period. Similarly, plaintiff relies on the statements of Witnesses 5 and 9, former CEC employees who were not employed during the Class Period. None of the allegations attributed to these witnesses indicates when any of the incidents that they describe occurred. *See* SAC ¶¶ 102-104, 106, 113, 120, 122, and 130.

Many of plaintiff's new allegations also suffer from the same deficiencies. In SAC ¶¶ 35 n.2-5, 36, 37, 67, 68, 113, 114, 119-120, 127[5], 128, 129, 130, 133, 149, 150-52, and 254, plaintiff attributes new factual allegations to confidential witnesses who were included in the ACC. Each of these paragraphs is deficient, however, because plaintiff failed to identify the time period when any of the alleged activities at issue occurred or quantify in a meaningful manner the effects of the allegedly improper activities. Likewise, many of the allegations attributable to new witnesses fail to specify any time period, *see* SAC ¶¶ 112, 115, 116, 120, 123, 134,[6] 137, 140, 143, and 153, to quantify in any manner the number of students or accounts affected by defendants' allegedly

---

[4]For example, while SAC ¶ 142 asserts that in 2003, there was a push to increase starts to meet objectives and that, as a result, "special needs" students, felons, homeless persons, and drug addicts were admitted, this paragraph only establishes with the requisite specificity that three students were admitted: one individual who was completely illiterate, one who performed at a 4th grade level, and one who performed at a 7th grade level.

[5]Although SAC ¶ 127 indicates that Witnesses 1, 2, 3, and 4 confirmed that many students were not fully packaged when entering CEC's schools, the only specific allegations were provided by Witness 1 and those allegations only pertained to 2002.

[6]SAC ¶ 134 involves a list of 216 students at one school who were deemed starts between 2002 and 2004, concluding that more than 200 students were improperly counted as part of the total student population. There is no distinction made from year to year. As such, it remains unclear whether the improper counting affected the entire period from 2002 to 2004 or just a portion of that period.

improper activities, *see, e.g.*, SAC ¶ 136, or to explain how these witnesses learned or were in a position to know of the allegations about which they provided statements. As such, plaintiff cannot rely on these allegations to raise the inference that CEC's statements and omissions made during the Class Period were false or misleading.

## II. *60 Minutes* Report and Congressional Testimony[7]

Plaintiff also relies on the January 30, 2005 report of the news program, *60 Minutes*, and the testimony of Congresswoman Maxine Waters regarding Brooks College to bolster his allegations. *See* SAC ¶¶ 91-101, 109. Such sources are not exempt from the pleading requirements of the PSLRA. *See, e.g., Thomson v. Morgan Stanley Dean Witter*, No. 01 CIV. 7071 (MP), 2001 WL 958925, at *1 (S.D.N.Y. Aug. 21, 2001) (characterizing as "jury speeches" the selected speeches of politicians and articles, reports, or news items from a variety of magazines, newspapers, and news broadcasts and stating that such speeches "are hardly what is known as elements of proper pleading of a right to relief" under the PSLRA).

### A. *60 Minutes* Report

The SAC alleges that the *60 Minutes* reporter interviewed more than 50 current or former employees at more than a dozen schools, three Brooks College graduates, two Brooks College admissions representatives, and Tami Hanson, the national manager in charge of student placement for all of CEC's campuses in the United States. SAC ¶¶ 92-95, 97. The reporter also relied on an evaluation report of the Western Association of Schools and Colleges for the report.

---

[7]Although the *60 Minutes* report and Congresswoman Waters' testimony occurred after December 5, 2003, the court considered these sources to the extent that they referred to events or incidents occurring prior to December 5, 2003. As is apparent in the court's analysis of these two sources, neither source is sufficiently reliable to support the inference that CEC's statements were false or misleading. Additionally, the court's review of these sources revealed that neither source had referenced events occurring prior to December 5, 2003.

11

Even ignoring the problems inherent in a news report from a television program like *60 Minutes*, *e.g.*, the reporter's biases, the editing of the interviews to tell a story, plaintiff cannot rely on a *60 Minutes* report to meet his pleading requirements under the PSLRA because he has failed to establish that the story related to incidents occurring during the Class Period or that it is probable that each of the interviewees had access to or knowledge of the allegations about which they spoke. For example, the admissions representatives essentially conceded that they did not have access to the information about which they spoke, stating that they found out later that what they were selling, the dream of having a 95 percent chance that a student will have a job paying $35,000 - $45,000 a year by the time that the student finishes the program in eighteen months, was not true. Moreover, none of the interviewees quantified the number of students affected by the allegations.

### B.     Congressional Testimony of Congresswoman Maxine Waters

Likewise, plaintiff cannot rely on the testimony of Congresswoman Waters to meet his pleading burden under the PSLRA. Congresswoman Waters testified before the U.S. House of Representatives Committee on Education and the Workforce Full Committee Hearing on "Enforcement of Federal Anti-Fraud Laws in For-Profit Educations" on March 1, 2005. SAC ¶ 98. Absent from the SAC, however, is any indication that Congresswoman Waters had access to or knowledge of the events and incidents about which she spoke. There are no allegations that Congresswoman Waters conducted an investigation into the allegedly improper practices of CEC or that she had first hand knowledge of these practices. Instead, it is apparent that Congresswoman Waters was relying on a report from the California Bureau for Private Post Secondary and Vocational Education dated December 1, 2004 of a "sampling" of Brooks College graduates. There is no other information, however, as to when or how the data were collected for the report or the size

of the student "sampling." Additionally, Congresswoman Waters' testimony as alleged in the SAC focused on one school, the Long Beach campus of Brooks College. At its most basic level, plaintiff's reliance on the testimony of Congresswoman Waters is no different than a party's reliance on the statement of a person who read a newspaper article as evidence of the matters asserted in the newspaper article. As such, Congresswoman Waters' testimony is not sufficiently reliable to support plaintiff's claim that defendants' statements and omissions were false or misleading.

## III. Student Population and Job Placement Figures

The SAC alleges that CEC misrepresented its starts, student population, and job placement numbers. The well-pled allegations in support of these assertions are found in SAC ¶¶ 105,[8] 112,[9] 121,[10] 124,[11] 125, 127,[12] 138, and 139. Even considering these allegations in the aggregate, they are insufficient to raise the inference that defendants' statements during the Class Period were false or misleading. These allegations purport to establish the following:

- CEC employees at one school in Pennsylvania had weekly conference calls with CEC's corporate headquarters to discuss student starts and collections on student accounts. SAC

---

[8] Although the court will consider SAC ¶ 105 in its analysis, the court finds somewhat troubling the allegation that Witness 13's "school held weekly conference calls." This allegation leaves unclear whether Witness 13 participated in these calls or whether Witness 13 was merely aware of the calls.

[9] Again, the court is including SAC ¶ 112 in its analysis but finds troubling Witness 25's assertion that the 90% job placement figure was significantly inflated. No further allegations are offered as to how inflated the figure was or how she arrived at this conclusion.

[10] The court is only considering the allegation that Witness 2 confirmed that for every quarter during her tenure at the CEC school (April 2002 - June 2003), the start date was extended by at least seven days.

[11] SAC ¶ 124 does not specify when Witness 26 examined the student files at the Brooks Institute of Photography but states that she voiced her concerns about missing proof of students' high school graduations and GEDs or lack of qualifications to her supervisor in mid-2003.

[12] The court is only considering the allegations in SAC ¶ 127 to the extent that they relate to the statements of Witness 1.

13

¶ 105. These calls included Larson and Pesch periodically. During these calls, unidentified corporate personnel would tell school officials to "do what ever it takes" to meet the start goals and bad debt goals set by corporate. *Id.*

- Admissions representatives would inform prospective students to the Katherine Gibbs school that Katherine Gibbs had a 90% placement rate, which was an inflated figure, and that, as graduates, they would receive well paying jobs in their chosen field after graduation. SAC ¶ 112.

- From April 2002 to June 2003, a CEC school in Massachusetts extended the start date by at least seven days every quarter. SAC ¶ 121.

- At the Brooks Institute of Photography, approximately five hundred student files per semester were missing proof of high school graduation or a GED or otherwise indicated that the student's high school grade point average was below 2.5, and therefore, the student was not qualified for admission. SAC ¶ 124. The registrar brought her concerns about these students to her supervisor in mid-2003, but no student was removed from the school for these reasons. *Id.*

- In late 2002 or early 2003, a new computer system was installed so that information regarding the status of all CEC student files could be accessed by CEC on an individual student basis, a school-wide basis, or a company-wide basis. SAC ¶ 125.

- For each quarter in 2002, only 70-80% of new students at a CEC school in Virginia were fully packaged. Of the unpackaged students, 42% would drop out in the ensuing quarter. SAC ¶ 127.

- In July of 2003, the Brooks San Jose school reported 114 students as starts; however, as of

August 5, 2003, only 53 of those students had submitted proof of their high school graduation or GED. As of August 29, 2003, at least 10 students had not submitted proof of their high school graduation or GED. SAC ¶ 138.

- In response to e-mails sent on August 29, 2003, Brian Williams, the Vice President of Operations for the Colleges West Division sent an e-mail to school personnel stating, "Nobody should be a drop until Jim McNair and the president approve. Our inability to keep students in school will result in a reduction in expense amounts left for the rest of the year due to the lost revenue." SAC ¶ 139.

Although these allegations provide some quantification of problems at various CEC schools with their starts, student population, and job placements, they only involve six schools, while CEC has seventy-eight campuses world-wide. SAC ¶ 2. Plaintiff's burden, however, was to raise an inference of fraud on a nation-wide level such that CEC's statements and omissions regarding its starts, student population, and job placement numbers nationally were false or misleading. Additionally, these allegations do not raise the inference that "do what ever it takes" meant engaging in improper accounting of its student starts or other student population statistics and graduation rates. Further, none of these witnesses purports to know what occurred at CEC with regard to these statistics; thus, none of these witnesses knows how the student population statistics at these six schools were incorporated into the statements concerning the student statistical data at issue in this case. As a result, plaintiff cannot establish that the starts, student population, and job placement problems at these these six schools were material to his injuries.

Because the allegations in the SAC fail to raise a reasonable belief that defendants' statements regarding its starts, student population, and job placement numbers were false or

misleading, the court grants defendants' motion to dismiss the SAC in that regard.

## IV. Historical Financial Results[13]

Turning to the allegedly false statements and omissions, the SAC alleges that defendants falsified or caused to be falsified three critical elements of CEC's financial performance: its bad debt expense, its revenues, and its earnings. Plaintiff also alleges that the financial information reported in the statements and reports issued by CEC during the Class Period were not prepared in accordance with generally accepted accounting principles ("GAAP").

### A. CEC's Financial Performance

Plaintiff asserts that CEC understated its bad debt expense by providing an insufficient allowance for doubtful accounts, by failing to stretch revenue recognition through the completion of externships, and by overstating revenue by improperly accounting for recourse loans. The SAC alleges generally that on a quarterly basis during the Class Period, CEC would disclose to the investing public an allowance for doubtful accounts ("allowance") with respect to tuition receivables and a bad debt to revenues ratio. SAC ¶ 34. This allowance was determined through the use of a template designed at CEC corporate under the supervision of Larson and Pesch. SAC ¶ 35. Under this template, an allowance would be established whenever a particular tuition receivable was outstanding in excess of a specified time period. *Id.*

According to Witness 18, the publicly reported allowance was significantly understated because CEC school controllers were directed to use a template formula for calculating each school's bad debt, which allowed old, past due accounts to be treated as current. *Id.* at n.1(1). Pursuant to

---

[13]The majority of allegations pertaining to CEC's historical financial results involve statements and incidents occurring after December 5, 2003. Because plaintiff lacks standing to assert claims based on those allegations, the court offers no decision as to the merits of those issues.

16

the template formula, a certain percentage of the amount owed would be allocated to the allowance depending on how old a particular accounts receivable was. *Id.* If, however, a minimal payment was made on the account, CEC would count the account as current without making an allowance for bad debt on that student account. *Id.* CEC generated reports showing the bad debt allowance before any partial payment was applied to these accounts. *Id.*

On March 8, 2003, Jason Licar, CEC's corporate manager, sent an e-mail to CEC's school comptrollers, that stated, in part,

> I want to bring to everyone's attention some information pertaining to the current status of our Q1 [2003] bad debt. With 3 full days left (Saturday to Monday), we still have significant opportunity to achieve our desired bad debt goal. Based on a "worst-case" scenario that we have been running on a daily basis, we as an organization are trending to report a 4.0%+ bad debt amount for Q1 – I must stress that this cannot be allowed to come to fruition. . . .I know, through talking with many of you over the past few weeks, that you have put your blood and sweat in to [*sic*] this cause – we are truly grateful for the achievements made thus far. Please realize that the effort is not over – we still have the weekend as well as Monday to make a significant impact on this month's bad debt. Please deploy all resources necessary to work the phones day and night, ask any temps you have to come in over the weekend, offer incentives to those out of school hard cases. We have been through all of our potential strategies in the past. Please pull out all of the stops by March 31st.

SAC, Exhibit D. On April 22, 2003, CEC issued a press release that reported a bad debt ratio of 3.8%. SAC ¶ 42.

The specific facts alleged with regard to the allowance calculations pertain to two CEC schools: Collins College and Brooks College-Long Beach. *See, e.g.*, SAC ¶¶ 43-44, 46. CEC's internal auditors cited weaknesses in internal controls in reports dated June 30, 2003 and July 31, 2003 regarding Collins College and Brooks College-Long Beach, respectively. SAC ¶ 43. The internal auditors found that both sites failed to provide adequately for accounts receivable. *Id.* The aggregate understatement of bad debt expense for the two schools in 2003 was $354,087. SAC ¶ 45.

17

Additionally, the internal auditors identified an aggregate amount of $380,783 in accounts that were being sent to collection agencies by these two schools. SAC ¶ 46.

Plaintiff attempts to establish the performance and practices of CEC's 74 sites based on the performance and practices of Collins College and Brooks College-Long Beach by "[assuming that the size of the understatements at the two sites was representative of the size of misstatements at the other sites . . . ." SAC at ¶ 45. Assumptions, however, are not facts, much less specific facts. Additionally, plaintiff relies on the statement of Witness 18; however, this witness only oversaw a maximum of eleven schools during his or her tenure with CEC. Plaintiff has not alleged how Witness 18 would have had access to or knowledge of the practices at other CEC schools, nor has Witness 18 provided specific allegations as to how "understated" CEC's allowance was in his or her schools, much less nation-wide. Absent specific factual allegations as to the other sites, plaintiff cannot establish that the understatements of bad debt expense or accounts receivables of Collins College and Brooks College-Long Beach are representative of CEC's 74 sites, much less that CEC's statements of its allowance for doubtful accounts in its financial statements, conference calls, press releases, etc. were false or misleading or that they were material to plaintiff's injuries. Additionally, even considering the Licar e-mail in conjunction with the allegations as to the understatement of the allowance for bad debt at Collins College, Brooks College-Long Beach, and Witness 18's eleven schools, there is no basis to infer that CEC was directing its employees to falsify bad debt ratios or otherwise alter bad debt allowances.

**B.    CEC's Alleged GAAP Violations**

Plaintiff's allegations with regard to the violations of GAAP are set forth in SAC ¶¶ 69 through 82. Many of these allegations recite the GAAP rules, objectives, and procedures without

specifying how the defendants violated them. *See* SAC ¶¶ 70, 71, 78-82. Plaintiff alleges that defendants violated the Financial Accounting Standard Board's Statement of Financial Accounting Concepts ("SFAC") No. 1 by failing to present accurate financial information about its business practices to its investors. *See* SAC ¶ 72-73. Plaintiff further alleges that CEC violated GAAP by failing to provide adequately for losses on its student loan receivables despite knowing that its student loan receivables were heavily populated with amounts due from individuals having a high credit risk. SAC ¶ 77. According to plaintiff, CEC also failed to make adequate provision for loan losses by intentionally calculating a lower allowance for doubtful accounts than was reasonable under the facts and circumstances. *Id.*

Because plaintiff's allegations based on the statements of his confidential witnesses and internal auditors' reports of two schools are an insufficient factual basis for any specific accounting violation, plaintiff has failed to adequately plead any GAAP violation. The court reaches no decision on the sufficiency of plaintiff's other allegations relating to defendants' scienter. Accordingly, defendants' motion to dismiss count one of the SAC is granted.

## V. Count II: Section 20(a)

This claim's survival depends on whether plaintiff's complaint adequately states a claim under § 10(b) and Rule 10b-5. *See In re Allscripts, Inc. Secs. Litig.*, No. 00 C 6796, 2001 WL 743411, at *12 (N.D. Ill. June 29, 2001) ("If a Complaint does not adequately allege an underlying violation of the securities law . . . the district court must dismiss the section 20(a) claim."). Plaintiff has failed to state a claim against CEC. Accordingly, their controlling person claims against the individual defendants are dismissed.

## ORDER

For the reasons stated above, defendants' Motion to Dismiss [#71] is granted without prejudice. Plaintiff may file a third amended complaint no later than April 17, 2006. This will be plaintiff's final opportunity to state a claim of securities fraud.[14] Plaintiff's Motion to Modify the Discovery Stay [#93] is denied as moot.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: March 28, 2006

---

[14] In Taubenfeld I, the court gave plaintiff one more chance to state a claim, which certainly implied that the SAC was to be plaintiff's final chance to state a claim. In the interest of justice and in ensuring that a claim of securities fraud, if such a claim exists, is decided on the merits rather than on procedural grounds, the most appropriate course of action is to permit plaintiff this final opportunity to plead a claim of securities fraud. Plaintiff should take note, however, that the quality of the allegations, rather than the quantity, is what is important in pleading a claim of securities fraud.