## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE CAREER EDUCATION CORPORATION SECURITIES LITIGATION | ) ) ) ) ) ) | 03 C 8884 Judge Joan H. Lefkow |

## MEMORANDUM OPINION AND ORDER

The buyers of stock in Career Education Corporation ("CEC"), including lead plaintiff Thomas Schroder and a putative class (collectively, "plaintiffs"), filed this suit alleging that defendants, CEC, John M. Larson (CEC's CEO) ("Larson"), and Patrick K. Pesch (CEC's CFO) ("Pesch") (collectively, "defendants"), committed securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j), and Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. They also allege that defendants Larson and Pesch are liable as control persons of CEC under Section 20(a) of the 1934 Act, 15 U.S.C. § 78(t). The court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

The case is before the court on defendants' motion to dismiss plaintiffs' third amended consolidated complaint ("the third amended complaint"). Two of plaintiffs' complaints have previously been dismissed without prejudice. *See* Mem. Op. and Order of February 11, 2005 (Dkt. No. 48); Mem. Op. and Order of March 28, 2006 (Dkt. No. 99). Last time, the court warned plaintiffs that they would have one final opportunity to state a claim for securities fraud. Mem. Op. and Order of March 28, 2006, at 20. For the reasons that follow, defendants' motion is granted. This case is dismissed with prejudice.

## I.    Background

CEC is a provider of private, for-profit post-secondary education with campuses worldwide and online.[1] Third Amended Consolidated Complaint for Violation of the Federal Securities Laws ("TAC"), at ¶ 2. During the class period, April 22, 2002 through February 15, 2005,[2] CEC made public statements about its performance in press releases, United States Securities and Exchange Commission ("SEC") filings, and conference calls. TAC, at ¶ 5, ¶¶ 220-328. It reported bad debt expense to revenue ratios that were comparatively positive to those of its competitors, "record" revenues and earnings, steadily increasing figures for new student "starts" and overall student population, and job placement rates for graduates in the 90th percentile and above. *Id.*

On February 15, 2005, when CEC announced its results for the fourth quarter of 2004 and the year ended December 31, 2004, the news was not quite so good. TAC, at ¶ 329. The press release indicated that CEC's financial results included the following two items: first, a restatement of its revenue for the financial periods 2000-2004 due to a change in its method of revenue recognition for certain student externships. TAC, at ¶ 330-31.[3] Second, CEC took a

---

[1] The court assumes familiarity with the background of this case as stated in its previous memorandum opinions, but restates the basic facts here for the convenience of the reader.

[2] Plaintiffs seek to amend the alleged class period to extend it further backwards in time from January 28, 2003 to April 22, 2002. Defendants oppose this, arguing that plaintiffs are attempting to validate previously rejected witness statements made in 2002 by moving the class period instead of substantively curing their allegations. Because the court has determined that plaintiffs' claims must be dismissed in any event, the dispute need not be addressed.

[3] It explained, "The new revenue recognition method recognizes tuition revenue through the end of the student's externship period, while the prior practice recognized revenue only over the period of in-school academic instruction.... The full-year and fourth quarter 2004 restatement

(continued...)

fourth quarter charge of $18.9 million due to an increased estimate for doubtful student accounts.[4] The 2004 Form 10-K was filed a month later, on March 16, 2005. TAC, at ¶ 335. The 10-K included the news that CEC was writing off $92 million of its student account receivables ("bad debt"). TAC, at ¶ 336 (citing CEC's 2004 Form 10-K). CEC's reserve against which this charge was taken was $153.2 million. Defendants' Reply Mem., at 13; CEC's 2004 Form 10-K (Filed March 16, 2005) (available at http://www.sec.gov/).[5]

Plaintiffs allege that defendants made materially false and misleading statements in their communications to investors throughout the class period by (1) understating and manipulating CEC's bad debt allowance and expense and its ratio of bad debt to revenue in violation of Generally Accepted Accounting Principles ("GAAP"); (2) overstating earnings in violation of GAAP; and (3) inflating reported figures for new student starts, overall student population, and job placement rates for CEC graduates. Plaintiffs' Mem. Opp. Mot. D., at 3. As noted above, the court has dismissed the same claims twice already. *See* Mem. Opp. and Order of Feb. 11,

---

[3](...continued)
resulted in a non-cash reduction of $11.5 million and $3.4 million in revenue and $0.06 and $0.02 per diluted share after taxes, respectively. This revenue will be earned and recognized in subsequent periods net of student refunds." TAC, at ¶ 331. This restatement is not a focus of plaintiffs' third amended complaint. Plaintiffs address it only in three paragraphs: 107-109.

[4] CEC said, "The company recently analyzed its receivables collection rates together with changes in financial aid funding sources and improved analytical tools, and determined it should increase its estimate for its allowance for doubtful accounts." TAC, at ¶ 332.

[5] Although plaintiffs did not attach the 10-K to their complaint, they cite extensively from it, and the statements therein are central to their securities fraud claims. Therefore, the court can consider the 10-K on this motion to dismiss. *Albany Bank & Trust Co.* v. *Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002). The court can also take judicial notice of SEC filings without converting a motion to dismiss into one for summary judgment. *Stavros* v. *Exelon*, 266 F. Supp. 2d 833, 844 n.8 (N.D. Ill. 2003).

3

2005, at 4; Mem. Opp. and Order of March 28, 2006, at 2-3. In both of those opinions, the court carefully examined each of the allegations and concluded that plaintiffs did not state a claim for securities fraud for various reasons: the complaint did not show that its confidential informants were reliable; the allegations were insufficiently particular in that they were vague as to when and to what extent any misconduct occurred; the allegations did not show that the misconduct had any effect on CEC's public statements or how and why those statements or omissions were rendered materially false or misleading; and the complaints did not adequately allege that the defendants acted with the requisite scienter.

In order to succeed on a claim under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, a plaintiff must prove that "(1) the defendant made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied and (6) that the false statement proximately caused the plaintiff damages." *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) (citing *Caremark, Inc.* v. *Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997)). At the outset of each case, plaintiffs must clear the high hurdles for pleading a securities fraud claim set by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("the PSLRA"), 15 U.S.C. § 78u-4(b). *Id.* at 594. "Under the PSLRA, a securities fraud complaint must (1) 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed' and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.*

4

(citing 15 U.S.C. § 78u-4(b)(1)). Because many of plaintiffs' allegations are based on information and belief acquired by counsel from confidential witnesses, plaintiffs must describe their sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Makor Issues & Rights*, 437 F.3d at 596.

Although it is 128 pages and 387 paragraphs long (26 pages and 100 paragraphs longer than the second amended complaint was), employs 27 confidential witnesses instead of 22, and attaches 27 additional documents, the third amended complaint still fails to state a claim for securities fraud. Despite the court's specific findings regarding the first and second amended complaints' deficiencies, and its explicit warning that "[p]laintiff should take note ... that the quality of the allegations, rather than the quantity, is what is important in pleading a claim of securities fraud," Mem. Op. and Order of March 28, 2006, at 20 n.14, the third amended complaint suffers from the same problems as its predecessors did.[6]

The majority of plaintiffs' new allegations are vague or otherwise unreliable, and none raise an inference that any of CEC's public statements were false or misleading. Critically, plaintiffs do not cite any competent witness or document to show how any of the alleged improprieties affected the truth of CEC's public statements. In addition, regardless of all other

---

[6] Unbelievably, plaintiffs have submitted some of the same paragraphs, verbatim or nearly so, as were rejected in the court's first *and* second memorandum opinions. Mem. Op. and Order of March 28, 2006, at 9 ("Despite the court's explicit counsel to plaintiff, plaintiff has resubmitted many of the same allegations without correcting their deficiencies."); *Compare* Amended Consolidated Complaint ("ACC"), at ¶ 38 with Second Amended Complaint ("SAC"), at ¶ 129 and TAC, at ¶ 193; ACC, at ¶ 39 with SAC, at ¶ 131 and TAC, at ¶ 201. Only slightly less incredible is the fact that plaintiffs have resubmitted allegations that have been rejected once before (as opposed to twice). *See, e.g.,* SAC, at ¶¶ 91-97; TAC, at ¶¶ 161-167; Defendants' Mem. Supp. Mot. Dismiss, at 4 n.2 (comparing additional paragraphs).

problems, plaintiffs' third amended complaint must be dismissed because they have failed to plead facts supporting a strong inference that the defendants acted with scienter, a deficiency that is sufficient by itself to require dismissal of the complaint. Plaintiffs again ask the court to view their allegations as a whole, Plaintiffs' Mem. Opp. Mot. D., at 15, 37, but as previously explained, the court cannot draw any inferences from allegations that are not themselves well pleaded; zero plus zero is zero. Mem. Op. and Order of March 28, 2006, at 3-4. For these reasons and because the court has already issued two comprehensive opinions, this memorandum will only highlight the insufficiency of plaintiffs' key allegations instead of undertaking a comprehensive review of the 387 paragraph complaint.

The court will begin with the first pleading hurdle of the PSLRA, which "requires the plaintiff to support with particularity the first two elements noted above: the falsity of the statement of fact or omission, and its materiality." *Makor Issues & Rights*, 437 F.3d at 595. In Section IV the court will address the independent requirement for plaintiffs to allege scienter.

## II. Allegedly False or Misleading Statements Regarding Understatement of Bad Debt Allowance, Expense, and Ratio of Bad Debt to Revenue

Plaintiffs' main focus is their theory that the defendants understated and manipulated CEC's bad debt allowance and expense and its ratio of bad debt to revenue, which ultimately led to the need to take an additional $18.9 million charge to increase its bad debt allowance and a $92 million write off of bad debt expense. "Bad debt" in this context is a past due student tuition account whose collectibility is doubtful. Plaintiffs allege, among other things, that CEC employees encouraged current and former students to make token "good faith" payments of $25

6

or less on their overdue debts. Based on those payments, CEC re-classified the students' loans as current, thereby decreasing its reported bad debt expense by millions of dollars. The individual allegations, however, do not support this "good faith payment" theory. For the following reasons, plaintiffs have not adequately alleged that any of CEC's public statements regarding bad debt were false or misleading.

Many of plaintiffs' allegations focus on management pressure on employees to reduce bad debt. *See, e.g.*, TAC, at ¶¶ 40, 44, 56, 57, 59, 62, Exs. C, D, E, G. Nothing in these allegations, however, indicates that CEC's management told employees to engage in improper accounting practices in order achieve their goals. It is proper for a company to attempt to reduce its bad debt; if CEC had not tried to do so, plaintiffs might be in court alleging a breach of fiduciary duty. *See* Mem. Op. and Order of March 28, 2006, at 15. Plaintiffs also allege that defendants had a "template" to calculate bad debt allowances, under which the allowance would be based on a percentage of the amount of the receivables, with the percentage increasing as the age of the receivables increased and the student left school. TAC, at ¶¶ 45, 47, 54. Plaintiffs do not adequately allege that this was improper.

Plaintiffs believe that the use of "good faith" payments to make a student's account current and thereby reduce reported bad debt violated GAAP and was fraudulent. Assuming that they are right, they are vague as to when and to what extent this occurred and how it affected CEC's financial statements. *See* TAC, at ¶¶ 45, 46, 52, 64, n.7. Additionally, many of the confidential witness statements that plaintiffs cite have still not been shown to be reliable. Plaintiffs have not shown that the witnesses have any basis for their knowledge for some of the statements, and for others, the witnesses are only relaying rumors and second-hand information.

7

*See, e.g.*, TAC, at ¶¶ 48, 51, 52, 53, 80, 92, fn.9. The only witness allegations that are sufficiently particular and arguably well-founded concern minimal discrepancies at only a few schools. *See, e.g.*, TAC, at ¶¶ 50 (bad debt at eight schools was reportedly 5%, but should have been between 6% and 12%), 55 (one school reported $2.5 million in bad debt, but should have reported $4 million in Witness 12's "professional judgment.").

New internal CEC documents attached to the third amended complaint provide some quantification of the use of "good faith payments" at certain CEC schools. Internal audits conducted at six CEC schools during the summer of 2003 found that without the use of good faith payments and the incorrect classification of some students as in school versus out of school, CEC's bad debt expense would have been negatively impacted by a total of approximately $900,000. TAC, at Exs. H-M. Plaintiffs also cite internal CEC "Bad Debt Improvement Reports," which reflect improvement of bad debt via good faith payments. *See* TAC, at Exs. F, N (Document entitled "Divisional Summary" stated that the effect of good faith payments on bad debt improvement was $14 million as of June 5, 2003), O, P, Q. There is no indication of who received these documents or when.

Plaintiffs implicitly ask this court to make an inference that defendants' use of good faith payments and misclassification of students ultimately led to the announcements made in 2005 that CEC had to increase its bad debt allowance by $18.9 million and write off $92 million of uncollectible accounts, but they do not explain the connection between the two. "A general allegation that the accounting practices at issue resulted in a false [financial] report is not a sufficiently particular claim of misrepresentation to satisfy Rule 9(b)." *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) (Lefkow, J.) (citing *Gross* v. *Summa*

8

*Four, Inc.*, 93 F.3d 987, 996 (1st Cir.1996)). "Rather, plaintiffs must allege the amount of the putative overstatement ... or the net effect it had on the company's earnings. *Id.* (citing, *inter alia, Roots Partnership* v. *Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir.1992) (allegation that company "failed to establish adequate reserves for its excessive and outdated inventory" does not satisfy Rule 9(b) where investor does not allege "what the company's reserves were or suggest how great the reserves should have been").)

Although it is *possible* that manipulations made by CEC employees had a material effect on CEC's overall bad debt calculations, it is also entirely possible that they had only an immaterial effect, or no effect at all, because the court does not know if or how any manipulated figures were incorporated into the final financial statements that were reported to the market.[7] Plaintiffs imply that CEC should have written off more of its bad debt earlier, but fail to say when or to offer any suggestion about what CEC's numbers should have been in any particular financial statement. "For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a [company] does this, someone may say that it should have acted sooner." *DiLeo* v. *Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The court cannot make the plaintiffs' suggested but unsupported inferences in the context of the PSLRA. *Davis* v. *SPSS, Inc.*, 385 F. Supp. 2d 697, 710 (N.D. Ill. 2005) ("plaintiff forgoes

---

[7] Witness 7, new for the third amended complaint, was "a senior accounting executive at CEC Corporate in Hoffman Estates throughout the class period. Witness 7 was responsible for the Company's consolidating internal and external financial statements and financial reporting." In the entire 387 paragraph complaint, however, Witness 7 is cited only 3 times, TAC, at ¶¶ 30(g), 47, 49, n.5, and he alleges nothing about CEC's financial statements.

providing necessary factual allegations, relying instead on the court to make connections unwarranted by the current pleadings.").[8][9]

Plaintiffs have not sufficiently alleged that any of defendants' statements regarding its bad debt were materially false or misleading when they were made. The court will move on to consider the next major category of allegedly fraudulent statements.

## III. Allegedly False or Misleading Statements Regarding Student-Related Information

Defendants allegedly issued false and misleading statements concerning critical business metrics of the company including its new student starts, total student population, and job placement rates. Additionally, plaintiffs allege that CEC schools incorrectly reported students' enrollment status to the United States Department of Education's National Student Loan Data System ("the NSLDS") and that they inflated reported income by withholding refunds of Title IV funds that should have been returned to the government.[10] For the following reasons, plaintiffs

---

[8] The fact that CEC assigned internal auditors to investigate bad debt accounting issues does not support an inference that it intended to conceal fraudulent accounting methods. Defendants' Reply, at 17 (citing *In re Watchguard Sec. Litig.*, 2006 WL 2927663, at *8 (W.D. Wash. Oct. 12, 2006) (allegation that a company assigned internal auditors to investigate an issue is "far more consistent with an attempt to remedy problems than an intent to mislead investors.").)

[9] The court notes that CEC apparently *did* maintain a sufficient student receivable allowance for bad debts in 2004 for the $92 million that it wrote off. Defendants' Reply Mem., at 13; CEC's 2004 Form 10-K (Filed March 16, 2005) (available at http://www.sec.gov/).

[10] A large portion of plaintiffs' allegations in this section of their complaint are unreliable. Some are vague as to what happened, when, and whether it had any effect on the truth of CEC's public statements. *See* TAC, at ¶¶ 144, 146-47, 155, 174-75, 183, 187, 193, 196-97, 199, 200, 214-15, 218, fn.15. Many of the confidential witnesses' allegations are based on rumor or second hand information. *See* TAC, at ¶¶ 147, 156-58, 161-67, 178, 188-89, 194-95, 213, 219.

have not adequately alleged that any of CEC's public statements regarding student-related information were false or misleading.

Plaintiffs believe that in violation of an internal CEC policy regarding who could be considered a "start," defendants included students in their start numbers who did not have proof of a high school diploma or a GED, who did not have a full package of financial aid, or who had not shown up for the first week of class. Defendants also moved start deadlines so that they could count late students as starts. The individual allegations do not support this theory.

First, the complaint again focuses on management's pressure on employees to meet their goal enrollment numbers for new student starts. TAC, at ¶¶ 140-42, 148, 169, fn.18. Pressure to meet performance goals, no matter how tough or unreasonable it might have been, is not evidence that CEC employees engaged in misconduct or fraud in order to meet those goals. Second, plaintiffs allege that many students who were counted as starts had not yet submitted proof that they had a high school diploma or a GED. TAC, at ¶¶ 143-44, 177, 179, 181, 184. The fact that some students had not submitted the necessary paperwork, however, does not show that they in fact had not graduated from high school. *But cf.* TAC, at ¶¶ 180, 185. Third, many students allegedly were not fully "packaged" when they started school; that is, they did not have financial aid and loans to cover 100% of their tuition, and were therefore likely to drop out. TAC, at ¶¶ 191-196. Packaging was not one of the criteria for a "start" according to CEC's internal guidelines, however. TAC, at ¶ 138. Furthermore, a lack of full packaging does not necessarily indicate that a student was sure to drop out, and the court must keep in mind that CEC was not representing to the market that all of its new student starts would stay in school through graduation. Fourth, plaintiffs' allegations that defendants moved their start deadlines in

order to count late students are generally vague and unreliable. *See, e.g.*, TAC, at ¶¶ 199-200. The exceptions, including paragraphs 145 and 172-73, show only minimal evidence of counting late students in the previous start period at a couple of schools and therefore are insufficient to support any inference that CEC's public statements were rendered materially false or misleading.

Plaintiffs also contend that defendants made false statements regarding CEC's overall student population numbers because they failed to account for students who had stopped attending class. TAC, at ¶¶ 182, 197-98, 201. In paragraph 182, Witness 5 says that in the "spring of 2002," she participated in an audit of students at Katherine Gibbs New York School, found 250 "phantom" students, and told defendant Larson at a meeting on May 13, 2002. In paragraph 197, Witness 10 says that at her school in the "end of 2003" the school's official population number was 775 but "the number of students who were active and attending classes was, in fact, closer to 650 students." TAC, at ¶ 197. In paragraph 198, Witness 17 reports that at his school, between 2002 and July 2004, 208 students were dropped "between 15 and 298 days" later than they should have been. Finally, in paragraph 201, Witness 2 says that between April 2002 and June 2003, "4-6% of the students in every quarter during her tenure should not have been counted as active students (*i.e.*, included as starts), as they were not attending classes." Even crediting all of these allegations, plaintiffs have not raised an inference that there was a problem with accurately reporting student population numbers at all of CEC's schools (or even a significant portion) that rose to the level of materially affecting CEC's public statements.

Moving on to plaintiffs' belief that CEC misrepresented its placement rate for graduates, plaintiffs allege that CEC reported a higher placement percentage than was actually achieved, in part by counting any job as related to the student's course of study. The problems with these

allegations are that many of CEC's statements were made to prospective students, not to the market, and plaintiffs do not allege that they relied on those statements in purchasing or retaining their CEC stock. TAC, at ¶¶ 134, 152, 155, 158. Plaintiffs complain that CEC included placements that the student had achieved without CEC's assistance in its numbers, but do not explain why this made reported placement percentages false. TAC, at ¶¶ 133, 156-57, 160. The only credible example of counting clearly unrelated jobs as related to the student's course of study is in paragraph 157 and concerns just one school. Paragraph 153 alleges that a May 2002 report shows only a 68% placement rate at 17 schools, but plaintiffs do not allege that any contemporaneous statement to the market was thereby rendered false.[11]

Finally, plaintiffs make allegations based on audits of CEC schools that found that the schools had incorrectly reported students' enrollment status to the Department of Education, withheld federal Title IV funds that should have been returned, or returned Title IV funds late. Plaintiffs ask the court to infer that based on this information, CEC's student population numbers in its public statements were false and its reported revenue was inflated.

In audits of seven CEC schools done for the federal government by Almich & Associates ("the Almich audits"), the auditors found that the schools incorrectly reported the enrollment status or graduation date to the NSLDS for some of their students. TAC, at ¶¶ 206-11, Exs. Y-EE. For the seven schools combined, 189 total students were incorrectly reported in 2002-2003. The possible effect of this was stated in the audits: "Incorrect reporting of student status changes

---

[11] In CEC's Annual Report for the year ending December 31, 2002, issued on March 10, 2003, it said "94.1 percent of our graduates who were available for employment for the academic year ended June 30, 2002, had found employment relating to their fields of study within six months of graduation." TAC, at ¶ 251.

may result in federal interest subsidies being paid toward loans that should be in repayment and are no longer eligible for the subsidies." While this may constitute evidence of poor record keeping, the court cannot infer from the fact that seven schools incorrectly reported the status of 189 students to the NSLDS that CEC materially misrepresented the size of its overall student population (which was between approximately 40,000 and 100,000 during the class period) in its SEC filings and other public statements.

Four reports were sent to CEC regarding schools that failed to return Title IV money to the federal government, or that failed to return money on time. TAC, at ¶¶ 112-14, 204-05, 208, 216-17, Exs. S, AA, EE. The first report concerned a review of student files for the years 2000-2003 at Collins College in Tempe, Arizona. TAC, at Ex. S. The report found that Collins improperly failed to return approximately $20,000 worth of Title IV funds and that it returned other funds later than it should have based on the timing of students' changes in enrollment status. *Id.*, at 10. Additionally, it found that Collins engaged in some improper accounting techniques which affected its eligibility to receive Title IV funds under the Department of Education's "90/10 rule," under which a school must receive a portion of its revenues from non-Title IV sources in order to remain eligible. *Id.*, at 21. Similarly, for Katherine Gibbs College in Montclair, New Jersey, Katherine Gibbs College in Boston, and the Cooking and Hospitality Institute of Chicago, the auditors found that the schools failed to return Title IV funds in a timely manner. TAC, at Exs. AA, EE, FF. Katherine Gibbs College in New Jersey failed to return funds on time for only two students. TAC, at Ex. AA. At Katherine Gibbs College in Boston, $105,143.77 worth of funds were returned between 12 and 598 days late. TAC, at Ex. FF. And

at the Cooking and Hospitality Institute of Chicago, funds for 23 students were returned late, amounting to at least $16,256.00.[12]

Although these reports indicate some sloppy accounting at a few of CEC's schools, the court cannot infer that any of CEC's statements to the market regarding its student population numbers or revenues were materially false or misleading. Plaintiffs have not identified any specific connection between the problems identified in the audits and any particular statement made by CEC.[13] Regardless, even if the court were to find these allegations sufficient to raise an inference that any of CEC's statements were rendered false, they must be rejected anyway because plaintiffs fail to raise a strong inference that defendants acted with the requisite scienter.

## IV. Scienter

As noted above, "with respect to each act or omission alleged" as false or misleading, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). That state of mind, or scienter,

---

[12] In paragraph 190, Witness 28, who worked a CEC Headquarters and is one of plaintiffs' new witnesses for the third amended complaint, says that a number of schools held on to funds for much longer than they were supposed to, and that the total amount withheld on a quarterly basis was at least $10-12 million. The court cannot credit this allegation because plaintiffs have failed to show that Witness 28 would have any basis to know this. Plaintiffs' only description of Witness 28 is that he "had a variety of executive titles including Vice President of Admissions for all of CEC." TAC, at ¶ 30bb.

[13] The court notes that CEC disclosed information relating to this subject in its financial statements. In its annual report for 2003, issued on March 12, 2004, CEC disclosed, "Institutions that receive Title IV Program funds that have been found during an audit or compliance review to have made late student refunds above a minimum threshold in either of their last two fiscal years must post a letter of credit with the DOE in an amount equal to 25% of the total Title IV Program refunds paid by the institution during its prior fiscal year. Based on this standard, we currently have posted a total of $4,100,066 in letters of credit with respect to 19 of our institutions."

is "the intent to deceive, manipulate, or defraud," *Ernst & Ernst* v. *Hochfelder,* 425 U.S. 185,

193, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976), or "an extreme departure from the standards of

ordinary care, which presents a danger of misleading buyers or sellers that is either known to the

defendant or is so obvious that the actor must have been aware of it." *Makor Issues & Rights,*

437 F.3d at 600 (citations omitted). Therefore, "not only must plaintiffs meet a particularity

requirement; they must also meet a substantive requirement by pleading sufficient facts to create

'a strong inference' of scienter." *Id.* at 601.[14] In their third amended complaint, plaintiffs have

failed to create a strong inference of scienter, and their case must be dismissed on that basis.

Plaintiffs cite the fact that there was a restatement of financial reports and the magnitude

of the alleged GAAP violations as evidence of defendants' state of mind. TAC, at ¶¶ 343-44.

These allegations are insufficient by themselves to support a strong inference of scienter. *See*

*DiLeo* v. *Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990); *In re Bally Total Fitness Sec. Litig.,*

2006 WL 3714708, at *7-*8 (N.D. Ill. July 12, 2006) (citing, *inter alia, DiLeo,* 901 F.2d at 627)

("The Seventh Circuit has observed that even a very large restatement [$4 billion] is not itself

evidence of scienter.").[15] Plaintiffs also note that Larson and Pesch were high-ranking

---

[14] The third amended complaint is replete with vague and conclusional allegations that
defendants or "CEC Corporate" knew or were aware of improprieties that occurred throughout
the company through their access to corporate information and participation in conference calls
and meetings regarding general topics such as "bad debt issues." *See, e.g.,* TAC, at ¶¶ 7, 25, 40,
42-43, 44-46, 52-54, 56, 59, 91-92, 110, 126, 144, 146-148, 175, 196, 341, fn.7, fn.8, fn.9, fn.13,
fn.16, Ex. C. These allegations clearly lack the requisite particularity and cannot be credited.
*See Davis* v. *SPSS,* 385 F. Supp. 2d at 716.

[15] Some courts have found that a large violation of GAAP, when combined with other
circumstances suggesting fraudulent intent, can bolster scienter allegations. *See, e.g., Davis* v.
*SPSS,* 385 F. Supp. 2d at 713-14 (citations omitted) ("While violations of GAAP provide some
evidence of scienter, they fall far short of raising a strong inference of knowing or reckless
(continued...)

16

executives, and ask the court to infer that their positions support an inference of scienter. "Scienter, however, may not rest on the inference that defendants must have been aware of a misstatement based simply on their positions within the company." *Bally Total Fitness* 2006 WL 3714708, at \*8 (citing *Davis* v. *SPSS, Inc.,* 385 F. Supp. 2d at 713-14 (quoting *Johnson* v. *Tellabs, Inc.,* 262 F. Supp. 2d 937, 957 (N.D. Ill. 2003); *Abrams* v. *Baker Hughes Inc.,* 292 F.3d 424, 432 (5th Cir. 2002)).[16] Furthermore, defendants' pressure on employees to meet financial and business goals does not establish an inference that defendants knew that any of their public statements were fraudulent. *See* TAC, at ¶¶ 7, 25(d), 56, 140-41, 342.

Plaintiffs' reliance on insider trading allegations to support an inference of scienter also fails, because they do not compare Larson's and Pesch's stock sales to any previous or subsequent trading activity, as they must in order to use insider trading to create an inference of

---

[15](...continued)
misrepresentation."). Here, there are no other circumstances with which to combine the alleged GAAP violations. The court also notes that plaintiffs' citation of *Selbst* v. *McDonald's Corp.,* 2005 WL 2319936 (N.D. Ill. Sept. 21, 2005), a case in which plaintiffs' lawyers here were involved, is inappropriate due to that court's later reversal of course and dismissal of their case in *Selbst* v. *McDonald's Corp.,* 432 F. Supp. 2d 777 (N.D. Ill. 2006) and *Selbst* v. *McDonald's Corp.,* NO. 04-C-2422, Minute Order dated December 15, 2006 (Dkt. No. 107).

[16] Plaintiffs' citation on this point of *In re Sears, Roebuck & Co. Sec. Litig.,* 291 F. Supp. 2d 722 (N.D. Ill. 2003) is not persuasive because that case is distinguishable from this one. Plaintiffs in *Sears* made particularized allegations that the individual defendants, high-ranking executives of *Sears,* personally made specific statements regarding the company's credit card business, which represented over half of its operating income. *Id.* at 724. Defendants stated that its credit card customers were "low risk" while the truth was that over 50% of them were in fact high risk at the beginning of the class period. *Id.* at 725. In this situation, the court was able to conclude that "defendants in their positions would be expected to have knowledge of the facts regarding the credit card portfolio at the time they were making statements about the portfolio." *Id.* at 727. As the court has discussed in Sections II and III, plaintiffs here have not adequately alleged the existence of any internal information that contradicted CEC's public statements. Therefore, *Sears* does not support an inference of scienter in this case.

scienter. *See* TAC, at ¶¶ 8, 21, 22, 345-46, 349, 351-52. "While insider trading may be sufficient circumstantial evidence of scienter, plaintiffs must show that the sale of stock is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Makor Issues & Rights*, 437 F.3d at 604 (citing *In re Silicon Graphics Sec. Litig.*, 187 F.3d 970, 986 (9th Cir. 1999)).

Similarly, the facts that Larson and Pesch both received bonuses based on CEC's performance, and CEC was able to make some stock-based acquisitions on favorable terms based on the inflation of its stock, do not indicate that the defendants acted with scienter. This court agrees with the view of numerous others that allegations that executives were motivated to achieve higher compensation and that a company was motivated to achieve buying power cannot be evidence of scienter because these motivations are common to every executive and every corporation. Allowing them to be evidence of scienter would eviscerate the requirement. *Bally Total Fitness*, 2006 WL 3714708, at **9-10 (citing cases).[17]

Larson's receipt of the Department of Education audits does not create an inference of scienter. In addition to the issues raised above regarding these reports, Larson received the audits long after the time periods which the audits were reviewing. TAC, Ex. S (Audit report regarding

---

[17] Plaintiffs' citations do not support them. *See, e.g., In re Spiegel, Inc. Securities Litigation,* 382 F.Supp.2d 989, 1027 (N.D. Ill. 2004) (citation omitted) ("a salary and benefits incentive is arguably too general to satisfy the scienter requirement, particularly in the absence of any additional evidence of wrongdoing, such as suspicious timing. Indeed, under Plaintiffs' argument, virtually any corporate executive would have the requisite intent to defraud, since most salaries and benefit packages have some incentive-based dimension."). Plaintiffs here have not adequately alleged suspicious timing or other additional evidence of wrongdoing.

Collins College's Title IV program in 2000-2003 dated July 14, 2004); Ex. AA (Almich audit report regarding Katherine Gibbs College in New Jersey for the year 2003 dated May 5, 2005).[18]

The remaining allegations regarding what Larson or Pesch knew do not support any inference that they made any extreme departures from the standards of ordinary care. In paragraph 143, Witness 28 states that "between 2002 and 2004, approximately 20% of the students who were counted as starts at CEC did not have proof of graduation or a GED." In paragraph 144, Witness 28 says that "Larson, Pesch, and other CEC executives knew about this" and Witness 28 attended "meetings with Larson and Pesch where this issue was discussed.... [L]ack of proof of graduation at various schools was discussed [*sic*] on numerous occasions during the class period at CEC's weekly Executive Committee meetings, the 'War Room Meetings' and on conference calls between Corporate and the Regional/Divisional Teams. These calls included Larson and/or Pesch...." Putting aside the point that a lack of *proof* of graduation or a GED does not mean that students in fact did not graduate or have a GED, this statement is generally vague about what Larson and Pesch knew and when they knew it. In paragraph 145, Witness 28 reports, "in December 2002/January 2003 two hundred students at the Gibbs School in New York were moved from one start period to another so that Pat Martin, a close associate of Larson, could make her start numbers.... Larson was definitely aware of that." As discussed above, the fact that 200 students were moved does not lead to the conclusion that any of CEC's public statements were materially misleading. Also, Witness 28 is vague about when Larson knew about this incident. Finally, in paragraph 182, Witness 5 states that "in the Spring of 2002,

---

[18] Plaintiffs must allege that defendants had knowledge that their statements were false or misleading at the time that they made those statements. *Bally Total Fitness*, 2006 WL 3714708, at *7; *In re Abbott Labs. Sec. Litig.*, 813 F. Supp. 1315, 1318-19 (N.D. Ill. 1992).

she participated in an audit of students at Katherine Gibbs New York School and determined that 250 of the students there were 'phantom' students who had been counted as starts by the admissions department (and that number was reported to Corporate), but were not attending school. She told Larson about this at an in-person meeting in New York on May 13, 2002." There is no indication in this allegation of what time period the audit reviewed, when the students stopped attending school, and what effect the numbers had on CEC's public statements. Larson's knowledge of it, even if assumed, does not matter.

The key allegation that the court again searched for and again found missing in plaintiffs' third amended complaint is any reliable statement that the defendants had knowledge of particular facts that rendered a specific statement materially false or misleading. Plaintiffs again ask the court to consider the totality of their complaint, but the court must again point out that aggregating all of plaintiffs' insufficient allegations does not add up to more than their sum.[19] The third amended complaint has not created a strong inference that defendants made any false or misleading statements with scienter.

## V.  Order

For the foregoing reasons, plaintiffs' securities fraud claim, along with its dependent control person liability claim, must be dismissed. Because the plaintiffs have had ample opportunities to research and plead their claims and have been warned that this was their last

---

[19] Plaintiffs suggest that even if scienter is not found on the part of the individual defendants, the court could find it on the part of CEC as a whole. The court disagrees, based on well-reasoned precedent and the fact that allowing that would eviscerate the scienter requirement. *See Bally Total Fitness*, 2006 WL 3714708, at *11 (citing *Caterpillar, Inc.* v. *Great Am. Ins. Co.*, 62 F.3d 955, 963 (7th Cir. 1995)).

chance to amend their complaint, defendants' motion to dismiss [#124] is granted, and this case is dismissed with prejudice. The clerk is directed to terminate it.

Dated: March 29, 2007

ENTER:

JOAN HUMPHREY LEFKOW
United States District Judge